STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
10-CvD-3498

BON AQUA INTERNATIONAL, INC.,    )
CONSTANCE C. LOWENSTEIN and    )
GERALD H. LOWENSTEIN,    )
    )
    Plaintiffs,    )
    )
    v.    )
    )
SECOND EARTH, INC., JOSEPH L.    )
NAZARIO, ELENA NAZARIO,    )
CHARLES M. ALEXANDER, RODNEY    )
S. SHAFFER, JOSEPH CHARLES, LLC,    )
DOUG FRAIN, ROBERT W. HASKIN,    )
JR., TIM TUCKER, CHRISTOPHER    )
HARGETT and JOSEPH CHARLES,    )
INC.,    )
    )
    Defendants.

**<u>AMENDED VERIFIED COMPLAINT</u>**
**(Jury Trial Demanded)**



Plaintiffs Bon Aqua International, Inc., Constance C. Lowenstein and Gerald Lowenstein,

by and through their undersigned counsel, hereby allege against Defendants as follows:

    1.    Plaintiff Bon Aqua International, Inc. ("BAI") is a corporation organized and

existing under and by virtue of the laws of the State of North Carolina with its principal place of

business in Guilford County, North Carolina.

    2.    Plaintiff Constance C. Lowenstein ("Ms. Lowenstein") is a citizen and resident of

Greensboro, Guilford County, North Carolina, is an officer, director and shareholder of BAI, and

owns copyrights related to BAI's water treatment systems.

    3.    Plaintiff Gerald H. Lowenstein ("Mr. Lowenstein") is a citizen and resident of

Greensboro, Guilford County, North Carolina, is an officer, director and shareholder of BAI, and

owns copyrights related to BAI's water treatment systems.

4.      Defendant Second Earth, Inc. ("Second Earth") purports to be a corporation organized and existing under and by virtue of the laws of a state other than North Carolina, and it is not registered to transact business in the State of North Carolina.

5.      Defendant Joseph L. Nazario ("Mr. Nazario"), upon information and belief, is a citizen and resident of Greensboro, Guilford County, North Carolina.

6.      Defendant Elena Nazario ("Ms. Nazario"), upon information and belief, was and is the Operations Manager of JC, LLC and the other Corporate Defendants, and is a citizen and resident of Greensboro, Guilford County, North Carolina.

7.      Defendant Charles M. Alexander ("Alexander"), upon information and belief, is a citizen and resident of Greensboro, Guilford County, North Carolina.

8.      Defendant Rodney S. Shaffer ("Shaffer"), upon information and belief, is a citizen and resident of Atlanta, Georgia, who has sufficient contacts with the State of North Carolina for the assertion of *in personam* jurisdiction by the Courts of North Carolina.

9.      Defendant Joseph Charles, LLC ("JC, LLC") is a limited liability company organized and existing under and by virtue of the laws of the State of North Carolina with its principal place of business in Guilford County, North Carolina.

10.      Defendant Doug Frain ("Frain"), upon information and belief, is a citizen and resident of Greensboro, Guilford County, North Carolina.

11.      Defendant Robert W. Haskin, Jr. ("Haskin"), upon information and belief, is a citizen and resident of Greensboro, Guilford County, North Carolina.

12.      Defendant Tim Tucker ("Tucker"), upon information and belief, was and is the Marketing Director of JC, LLC and the other Corporate Defendants, and is a citizen and resident of Greensboro, Guilford County, North Carolina.

2

13.     Defendant Christopher Hargett ("Hargett"), upon information and belief, is a citizen and resident of Greensboro, Guilford County, North Carolina.

14.     Defendant Joseph Charles, Inc. ("JCI") is a corporation organized and existing under and by virtue of the laws of the State of North Carolina with its principal place of business in Guilford County, North Carolina.

15.     For nearly twenty (20) years, BAI has manufactured, sold and installed Bon Aqua water treatment systems throughout the United States and the world.

16.     BAI is a leader in the industry in the treatment of scale and corrosion in all water cooled heat exchange equipment. In addition, since 2009, BAI has also sold as added features of the Bon Aqua water treatment systems: (a) an electrolytic ionizer to create an entirely chemical free treatment system; and (b) an automatic monitoring system.

17.     Customers of BAI, therefore, have the option of using the Bon Aqua water treatment system with or without chemicals and with or without a monitoring system.

18.     Upon information and belief, BAI is the only company in the world to successfully use either the ionizer or the monitoring system in conjunction with a non-chemical water treatment system.

19.     In early 2008, JC, LLC, by and through Mr. Nazario and Alexander, expressed to Plaintiffs a desire to represent BAI in connection with the sale, installation, and service of Bon Aqua water treatment systems.

20.     On or about April 25, 2008, JC, LLC and BAI entered into a Sales Agency Agreement. A copy of the Sales Agency Agreement is attached hereto and incorporated herein as Exhibit A.

3

21.     BAI entered into the Sales Agency Agreement with JC, LLC because Defendants Mr. Nazario and Alexander represented to Plaintiffs, among other things that:  (1) they would actively market BAI's Bon Aqua water treatment systems; (2) they would use information provided to them by Plaintiffs in order to promote sales of BAI products and systems, rather than to benefit persons or entities in competition with BAI; and (3) they would keep confidential the copyrighted materials, know-how, marketing materials, training materials, customer lists, pricing lists, systems and other trade secrets and confidential information, as that term is defined in the Confidentiality Agreement referred to in Paragraph 25, below (hereinafter, the "Protected Information") provided to them by Plaintiffs.

22.     In fact, upon information and belief, Defendants Mr. Nazario, Alexander and JC, LLC never intended to honor the terms of the Sales Agency Agreement or the representations set forth in Paragraph 21; instead, Mr. Nazario, Alexander and JC, LLC formulated a plan or scheme to acquire BAI's Protected Information under false pretenses and then use the Protected Information to establish a competing company, destroy the reputation of BAI and misappropriate BAI's Bon Aqua water treatment systems, goodwill and business (the "Scheme").

23.     In furtherance of the Scheme, shortly after entering into the Sales Agency Agreement, Defendants Mr. Nazario, Alexander and Shaffer represented to BAI that, due to the quality of BAI's Bon Aqua water treatment systems, goodwill, reputation and business, and the opportunity to grow BAI's business, they sought to purchase BAI, as well as Aquadyne Inc. (a dealer of BAI Bon Aqua units owned solely by Mr. and Mrs. Lowenstein), by entering into an Option Agreement.

24.     Upon information and belief, the true purpose for Defendants Mr. Nazario, Alexander and Shaffer causing JC, LLC to enter into the Option Agreement was:  (a) to gain

4

total, unfettered access and use of BAI's Protected Information; (b) to acquire possession of at least 2,500 BAI units for a relatively low investment; and (c) use the acquired Protected Information and BAI units to wrongfully establish a company in competition with BAI and thereby permanently and irreparably damage BAI's business, reputation and goodwill. A copy of the Option Agreement is attached hereto and incorporated herein as Exhibit B.

25.    Furthermore, and in furtherance of the Scheme, Defendants Mr. Nazario, Alexander and Shaffer caused JC, LLC to enter into a Confidentiality Agreement with BAI, which was designed to protect all of BAI's Protected Information. However, Defendants Mr. Nazario, Alexander, Shaffer and JC, LLC never intended to comply with the terms of such Confidentiality Agreement. A copy of the Confidentiality Agreement is attached hereto and incorporated herein as Exhibit C.

26.    In furtherance of the Scheme, Defendants Mr. Nazario, Alexander, JC, LLC and Shaffer conspired with others, including some or all of the other Defendants, to:   (a) feign cooperation with Plaintiffs in making presentations for sales of BAI units; (b) form new entities through which they intended to wrongfully transfer some or all of BAI's Protected Information, without notifying Plaintiffs; and (c) take actions to otherwise harm Plaintiffs' reputation with its customers, all in an effort to establish a competing business and destroy Plaintiffs' businesses, goodwill and reputation and cause damages in the millions of dollars to Plaintiffs.

27.    In November of 2008, Vince Pagani, an owner of IGS (Innovative Green Solutions), a North Carolina cleaning/maintenance business, approached Mr. Lowenstein about becoming a dealer for BAI; Mr. Lowenstein directed him to JC, LLC. Mr. Pagani and Defendant Frain agreed to work with JC, LLC to sell Bon Aqua water treatment products.

5

28.     On or before March 20, 2009, Defendants Alexander, Mr. Nazario and JC, LLC, in furtherance of the Scheme and without the knowledge of Plaintiffs, registered an internet domain name for one of the businesses that they intended to be in competition with Plaintiffs. The domain name is "SECONDEARTHINC.COM". A copy of the registration information is attached hereto as Exhibit D.

29.     In Spring of 2009, Mr. Nazario informed Mr. Lowenstein that Mr. Nazario, Shaffer, Alexander and JC, LLC had "joined forces" with Frain, a part owner of a national cleaning/maintenance business, and that they were not going to involve Mr. Pagani. Upon information and belief, Frain then agreed with the other Defendants to participate in and effectuate the Scheme.

30.     In furtherance of the Scheme, some of Defendants began to travel around the country making contacts and presentations about the Bon Aqua water treatment systems. Defendants represented to Plaintiffs that: (a) such contacts and presentations were being made to promote BAI's business; and (b) Defendants would keep Plaintiffs informed about the progress of such presentations and would provide copies of proposals made by Defendants to various persons and entities. A copy of an email from Alexander dated May 1, 2009 is attached hereto as Exhibit E.

31.     In fact, Defendants never intended for the contacts and presentations to promote or assist BAI; instead, Defendants intended to build and grow the businesses of Second Earth and JC, Inc. (in competition with BAI) by touting the Bon Aqua water treatment system and claiming that it was part of the new and improved "WRAP" water treatment system.

32.     At some point, Defendants decided to abandon the name and company, Joseph Charles, LLC, and use only the names, Second Earth, Inc. and Joseph Charles, Inc, as entities in

6

furtherance of the Scheme. Plaintiffs were not informed that Defendants were making that change.

33.　In or about September of 2009, Defendants represented to Plaintiffs that they were interested in proceeding with the purchase of BAI and Aquadyne. In connection with the alleged interest to proceed with the purchase, Mr. Nazario was the main contact with the Lowensteins, yet he began to mention Haskin as his attorney.

34.　For the next two months, Mr. Nazario continued to represent to Plaintiffs that they were getting close to closing on the purchase and that Plaintiffs would soon be "getting a check." At the same time, and in furtherance of the Scheme, Defendants were requesting more Protected Information from Plaintiffs, under the guise of needing the Protected Information for the purchase. Moreover, upon information and belief, Defendants continued making contacts and presentations of the "WRAP" water treatment system, which included Bon Aqua units and the ionizer, without Plaintiffs' knowledge, also in furtherance of the Scheme.

35.　In furtherance of the Scheme, on or about November 10, 2009, Mr. Nazario delivered to Plaintiffs proposed Letters of Intent for the purchase all of Plaintiffs assets related to Bon Aqua. The terms of the purchase, though, were not at all what had been discussed with Plaintiffs and were unacceptable to Plaintiffs. Further, Mr. Nazario demanded that such Letter of Intent be signed that same day. A copy of the Letter of Intent and related emails from Mr. Nazario are attached hereto as Exhibit F. In response, Plaintiffs delivered to Defendants for their review revised Letters of Intent. A copy of the revised Letters of Intent are attached hereto as Exhibit G.

36.　In late November or early December of 2009, Plaintiffs began to suspect that Defendants were using and attempting to use Plaintiffs' Protected Information to, among other

7

things, avoid compliance with the Agreements JC, LLC had made with BAI. As a result, Plaintiffs notified Defendants that they withdrew the revised Letters of Intent (attached hereto as Exhibit G) and they sought from Defendants assurances that they were complying with their obligations to BAI. A copy of a string of emails between Mr. Nazario and Mr. Lowenstein are attached hereto as Exhibit H.

37. By email dated December 5, 2009, Mr. Nazario advised Mr. Lowenstein for the first time that JC, LLC was "now insolvent," and Mr. Nazario made demands upon BAI which were inconsistent with the June 2, 2008 Option Agreement. A copy of the December 5 email is attached hereto as Exhibit I. Plaintiffs attempted to work with Defendants (through Mr. Nazario) to find a resolution mutually beneficial, but Defendants refused any such resolution. A copy of an email from Mrs. Lowenstein to Mr. Nazario is attached hereto as Exhibit J.

38. By letter dated December 15, 2009, Plaintiffs (through their attorney) responded to Defendants (through Mr. Nazario) and iterated that the June 2, 2008 Option Agreement remained in place, that the Bon Aqua units in Defendants possession were owned by BAI and that they could not be disposed of except pursuant to the terms of the Option Agreement. A copy of the December 15 letter is attached hereto as Exhibit K. Plaintiffs also presented a proposal to amicably resolve the dispute about the Bon Aqua units. At this time, Plaintiffs were still unaware of the Scheme.

39. At some point after December 15, 2009 and before December 21, 2009, Plaintiffs began learning of some of the actions that Defendants had been taking in furtherance of the Scheme. For example, Plaintiffs received from Elon University a copy of a proposal that had been made to it by Second Earth, Inc. for the so called "WRAP" water treatment system. The

8

proposal is virtually identical to the proposal made to Elon University by BAI (in partnership with JC, LLC) in July of 2008. The Second Earth proposal states, among other things:

> We offer a water treatment program unequaled in the treatment of scale and corrosion in all water cooled heat exchange equipment. Although the WRAP system alone is neither bacteriostatic nor bactericidal, the addition of our electrolytic ionizer creates an entirely chemical free treatment system, totally in accordance with the highest environment standards.

The July 2008 BAI proposal states, among other things:

> We offer a water treatment program unequaled in the treatment of scale and corrosion in all water cooled heat exchange equipment. Although the Bon Aqua system alone is neither bacteriostatic nor bactericidal, the addition of our electrolytic ionizer creates an entirely chemical free treatment system, totally in accordance with the highest environment standards.

40.     A comparison of the July 2008 BAI proposal, attached hereto as Exhibit L, with the Second Earth proposal, attached hereto as Exhibit M, shows that they are virtually identical.

41.     By letter dated December 21, 2009, Plaintiffs confronted Defendants about the use of the Protected Information and the sale of Bon Aqua units under the name of the so called "WRAP" system. A copy of the December 21 letter is attached hereto as Exhibit N.

42.     In response to the various inquiries made to Defendants (but without knowing that Plaintiffs had a copy of the Elon University proposal in its possession), Defendants (by and through Haskin):  (a) denied any wrongful activity;  (b) stated that Second Earth had no relationship with JC, LLC;  (c) stated that Second Earth is not marketing or selling Bon Aqua units; and (d) stated that Second Earth was marketing and attempting to sell a "new concept of water treatment" that "does not utilize [BAI's] product." In addition, Haskin threatened to sue Plaintiffs for interfering with Second Earth's marketing and sale of the so called "WRAP" system. A copy of Haskins' letter is attached hereto and incorporated herein as Exhibit O.

9

43.     As a result of the information learned by Plaintiffs and the suspicious communications by Defendants, Plaintiffs have continued to investigate the actions of Defendants and have learned, in the past days, weeks and couple of months, that: (a) Defendants are using BAI's copyrighted sales video and other copyrighted materials, including BAI's logo (a copy of a print out of Second Earth's website is attached hereto as Exhibit P); (b) Defendants have sought to register as a trademark, "Bon Aqua V" for an industrial-water purifying apparatus" (a copy of a print out of the United States Patent and Trademark Office related to a search for Bon Aqua, together with that Trademark application is attached hereto as Exhibit Q); (c) Defendants have registered Second Earth on thebluebook.com, have listed Second Earth's product as "Bon Aqua" and have listed ongoing projects for Bon Aqua water treatment systems (a copy of a page from thebluebook.com is attached hereto as Exhibit R); and (d) Defendants are using Plaintiffs' Protected Information to contact BAI's vendors and provide to them false information, including a contact in the past few days with the son of the inventor of the Bon Aqua unit, wherein Haskin told him that he was in the process of buying BAI.

44.     In addition, Defendants, in furtherance of the Scheme, have misappropriated the Bon Aqua name and Bon Aqua water treatment units and have published false and defamatory statements about the history of Bon Aqua, all in an effort to irreparably harm Plaintiffs and profit financially from the misappropriation of the Protected Information and Bon Aqua water treatment units. In that regard, Defendants now represent that:

> "the product Bonaqua (now from Joseph Charles, Inc.) has been around for more than 20 years, it was never marketed appropriately..."

A copy of an internet publication disseminated by Defendants is attached hereto as Exhibit S.

10

45. As a direct, proximate and foreseeable result of the actions of Defendants, including the acts in furtherance of the Scheme, and the concerted steps to hide the Scheme and the actions taken in furtherance thereof, Plaintiffs have suffered and will continue to suffer damages and irreparable harm.

46. If a preliminary injunction and permanent injunction are not issued, Plaintiffs will suffer immediate and irreparable harm including permanent and irreparable damage to their reputation and business, which damage is not compensable by money damages alone.

47. Upon information and belief, at all relevant times, JC, LLC was a sham corporation, which was created to perpetrate a fraud against Plaintiffs. In addition, JC, LLC did not observe corporate formalities, nor did it have adequate capitalization; therefore, it was a sham entity wholly controlled by and the alter ego of Mr. Nazario and Alexander. The allegations herein that are asserted against JC, LLC are, therefore, asserted as well against Mr. Nazario and Alexander under the principles of piercing the corporate veil.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

48. Plaintiffs repeat and reallege Paragraphs 1 through 47 of the Complaint as if repeated and realleged herein.

49. BAI entered into various written agreements with JC, LLC, Mr. Nazario and Alexander, to wit: the Sales Agency Agreement, the Option Agreement and the Confidentiality Agreement.

50. JC, LLC, Mr. Nazario and Alexander have breached and are breaching the Sales Agency Agreement, the Option Agreement, and the Confidentiality Agreement as follows, but without limitation: (a) knowingly selling or attempting to sell Bon Aqua water treatment

11

systems or units to companies that were being served by other BAI salespersons, including Aquadyne; (b) acting as a "reseller" of Bon Aqua units; (c) selling Bon Aqua units without approval by BAI; (d) claiming ownership of Bon Aqua units owned by BAI; (e) disclosing the Protected Information in violation of the Confidentiality Agreement; (f) otherwise violating the Confidentiality Agreement by taking actions as if and representing to others that they were owners of, or had rights, license or authority in any of the Protected Information; and (g) failing and refusing to pay to BAI moneys to which it is entitled.

51.     Upon information and belief, Defendants Alexander, Mr. Nazario, Shaffer, Frain, Haskin, Second Earth and JC, Inc. purport to be successors and/or assigns to the Option Agreement and the Confidentiality Agreement and, therefore, said Defendants have breached the Option Agreement and the Confidentiality Agreement as outlined in Paragraph 50, above.

52.     As a result of the various breaches by Defendants, BAI has been damaged in an amount in excess of $10,000.00.

## SECOND CLAIM FOR RELIEF
### (Conversion)

53.     Plaintiffs repeat and reallege Paragraphs 1 through 52 of the Complaint as if repeated and realleged herein.

54.     As alleged herein, Defendants have wrongfully:  (a) upon information and belief, sold Bon Aqua water treatment units without making payment to BAI; (b) taken and retained possession of BAI's Bon Aqua water treatment units; and (c) wrongfully taken and used BAI's "Bon Aqua" name and the Lowenstein's copyrighted materials.

12

55. As a result of the wrongful acts of Defendants as set forth herein, Plaintiffs have been damaged in excess of $10,000.00 and are entitled to recover such damages from Defendants, jointly and severally.

56. Further, as a result of the intentional and wrongful conduct of Defendants as set forth herein, Plaintiffs are entitled to recover punitive damages from Defendants, jointly and severally, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Fraud)

57. Plaintiffs repeat and reallege Paragraphs 1 through 56 of the Complaint as if repeated and realleged herein.

58. Defendants deceived Plaintiffs by means of false representations of material facts, concealment of material facts, or both (herein collectively referred to as "misrepresentations").

59. Defendants' misrepresentations included, but were not limited to: (a) creating the Scheme and acting in furtherance of the Scheme; (b) failing to actively market BAI's Bon Aqua water treatment systems for the benefit of BAI; (c) using Protected Information to irreparably harm BAI and its business, reputation and goodwill, and to benefit themselves in competition with BAI; (d) failing to keep confidential the Protected Information; (e) feigning cooperation with Plaintiffs in making presentations for sales of BAI units; (f) forming new entities (including Second Earth and JC, Inc.) through which they wrongfully transferred some or all of BAI's Protected Information, without notifying Plaintiffs; (g) making contacts and presentations about the so called "WRAP" water treatment system and failing to inform Plaintiffs about such contacts and presentations; (h) making presentations about BAI's Bon Aqua units as if the corporate Defendants, or some of them, not BAI, owned the rights to such units; (i) claiming that

13

they owned copyrights owned by Mr. and Mrs. Lowenstein; (j) claiming to be interested in purchasing Plaintiffs' rights and assets relating to BAI and Aquadyne, though they were solely interested in misappropriating the Protected Information and competing with the businesses of BAI and Aquadyne; (k) using copyrighted sales videos and other copyrighted materials; (l) attempting to register as a trademark, "Bon Aqua V" for an industrial-water purifying apparatus" and purporting to use such "trademark" for sales and marketing; (m) registering Second Earth on thebluebook.com as having 20 years of history in the business of water treatment systems and listing Second Earth's product as "Bon Aqua"; and (n) publishing false and defamatory statements about Plaintiffs, the history of BAI and their business practices.

60. Defendants' misrepresentations were made with knowledge of their falsity or with reckless disregard of their falsity.

61. The misrepresentations made by Defendants were reasonably calculated to deceive Plaintiffs or Defendants made such representations with reckless indifference as to their truth.

62. Plaintiffs reasonably relied upon the misrepresentations made by Defendants to their detriment and Plaintiffs were, in fact, deceived by the misrepresentations.

63. Plaintiffs could not have learned of the falsity of such misrepresentations through the exercise of due diligence.

64. Upon information and belief, Defendants' misrepresentations were made in order to, among other things: (a) effectuate the Scheme; (b) gain total, unfettered access and use of the Protected Information; (c) acquire possession of at least 2,500 BAI units for a relatively low investment, well below market value; and (d) use the acquired Protected Information and BAI

14

units to wrongfully establish companies in competition with BAI and thereby permanently and irreparably damage BAI's business, reputation and goodwill.

65.     As a proximate result of the actions of Defendants as set forth herein, Plaintiffs have sustained damages in excess of $10,000.00 and are entitled to recover such damages from Defendants, jointly and severally.

66.     Plaintiffs are further entitled to recover from Defendants, jointly and severally, punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

67.     Plaintiffs repeat and reallege Paragraphs 1 through 66 of the Complaint as if repeated and realleged herein.

68.     Defendants' misrepresentations as set out in Paragraph 59, above, constituted false information for the guidance of Plaintiffs in a business transaction in which Defendants had a pecuniary interest.

69.     Defendants' misrepresentations were definite and specific.

70.     Defendants failed to exercise reasonable care or competence in obtaining and/or communicating the false information to Plaintiffs.

71.     Defendants' misrepresentations as set out above were made with the intention that Plaintiffs should act upon them.

72.     Plaintiffs reasonably relied upon Defendants' misrepresentations and acted upon them, and could not with due diligence have learned the true facts.

73.     As a result of Defendants' misrepresentations, Plaintiffs suffered actual, incidental, and consequential damages in an amount in excess of $10,000.00.

15

## FIFTH CLAIM FOR RELIEF
### (Violation of Chapter 66)

74.     Plaintiffs repeat and reallege Paragraphs 1 through 73 of the Complaint as if repeated and realleged herein.

75.     The Protected Information drives independent commercial value, whether actual or potential, from not being generally known or readily ascertainable through independent development or reverse engineering by a person who can obtain economic value from its disclosure or use.

76.     The Protected Information is known only to Plaintiffs and those who are contractually bound to keep such information confidential.

77.     The Protected Information is extremely valuable to Plaintiffs and their business and, without which, Plaintiffs and their business would suffer irreparable harm.

78.     The Protected Information is extremely valuable to Defendants and Plaintiffs' competitors, and Defendants could not have lawfully acquired or duplicated the trade secrets nor taken actions in furtherance of the Scheme without the Protected Information.

79.     The Protected Information has been the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

80.     Defendants misappropriated Plaintiffs' trade secrets.

81.     As a proximate result of Defendants misappropriation of Plaintiffs' Protected Information, Plaintiffs suffered actual, incidental, and consequential damages in an amount in excess of $10,000.00.

16

82. Pursuant to N.C. Gen. Stat. § 66-153, *et seq.*,, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction, and an award of attorney's fees.

## SIXTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. § 75-1.1)

83. Plaintiffs repeat and reallege Paragraphs 1 through 82 of the Complaint as if repeated and realleged herein.

84. The foregoing acts and practices of Defendants were immoral, unethical and unscrupulous, possessed the tendency or capacity to mislead and deceive Plaintiffs and created the likelihood of deception to Plaintiffs.

85. The acts of Defendants as set forth herein were in and affecting commerce.

86. The acts of Defendants alleged herein constitute unfair and deceptive acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

87. As a proximate result of the unfair or deceptive acts or practices of Defendants, Plaintiffs have suffered damages in excess of $10,000.00 in an amount to be proven at trial.

88. Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs are entitled to have any damages awarded by the Court be trebled.

89. Pursuant to N.C. Gen. Stat. § 75-16.1, Plaintiffs are entitled to an award of attorney's fees.

## SEVENTH CLAIM FOR RELIEF
### (Temporary, Preliminary, Permanent, and Mandatory Injunction)

90. Plaintiffs repeat and reallege Paragraphs 1 through 89 of the Complaint as if repeated and realleged herein.

91.     Defendants' actions, taken in furtherance of the Scheme, are causing immediate and irreparable harm to Plaintiffs for which there is no adequate remedy at law.

92.     By virtue of Defendants' actions as alleged herein, Plaintiffs are entitled to have this Court temporarily, preliminarily and permanently order that:

(a)     Defendants, and any other person or entity acting through, in concert with or on behalf of Defendants, are restrained and prohibited from transferring, selling, marketing, promoting, assigning, disclosing or otherwise using: (i) the name "Bon Aqua"; (ii) any copyrights, know-how, marketing materials, training materials, systems, customer lists, pricing lists and any other trade secrets and confidential information owned by Plaintiffs; (iii) Bon Aqua water treatment units; (iv) the Bon Aqua water treatment system;

(b)     Defendants, and any other person or entity acting through, in concert with, or on behalf of Defendants, are restrained and prohibited from contacting or in any way communicating with any person or entity, including, without limitation, prior and existing customers of Plaintiffs (including Aquadyne, Inc., a Bon Aqua International, Inc. dealer solely owned by the individual Plaintiffs), about the Bon Aqua water treatment system;

(c)     Defendants are ordered to provide to this Court and Plaintiffs, on or before March 15, 2010, a detailed list, including names, addresses, phone numbers and email addresses of all persons and entities contacted by Defendants, and any other person or entity acting through, in concert with or on behalf of Defendants, about the Bon Aqua water treatment system.

18

## EIGHTH CLAIM FOR RELIEF
### (Constructive Trust)

93.     Plaintiffs repeat and reallege Paragraphs 1 through 92 of the Complaint as if repeated and realleged herein.

94.     Defendants' misrepresentations included, but were not limited to: (a) creating and acting in furtherance of the Scheme; (b) failing to actively market BAI's Bon Aqua water treatment systems for the benefit of BAI; (c) using Protected Information to irreparably harm BAI and its business, reputation and goodwill, and to benefit themselves in competition with BAI; (d) failing to keep confidential the Protected Information; (e) feigning cooperation with Plaintiffs in making presentations for sales of BAI units; (f) forming new entities (including Second Earth and JC, Inc.) through which they wrongfully transferred some or all of BAI's Protected Information, without notifying Plaintiffs; (g) making contacts and presentations about the so called "WRAP" water treatment system and failing to inform Plaintiffs about such contacts and presentations; (h) making presentations about BAI's Bon Aqua units as if the corporate Defendants, or some of them, not BAI, owned the rights to such units; (i) claiming that they owned copyrights owned by Mr. and Mrs. Lowenstein; (j) claiming to be interested in purchasing Plaintiffs' rights and assets relating to BAI and Aquadyne, though they were solely interested in misappropriating the Protected Information and competing with the businesses of BAI and Aquadyne; (k) using copyrighted sales videos and other copyrighted materials; (l) attempting to register as a trademark, "Bon Aqua V" for an industrial-water purifying apparatus" and purporting to use such "trademark" for sales and marketing; (m) registering Second Earth on thebluebook.com as having over 20 years of history in the business of water treatment systems

19

and listing Second Earth's product as "Bon Aqua"; and (n) publishing false and defamatory statements about Plaintiffs, the history of BAI and their business practices.

95.     Defendants' wrongful conduct has deprived Plaintiffs of the beneficial interests to which Plaintiffs are entitled in the Protected Information and any BAI Bon Aqua units that Defendants have in their possession.

96.     Under the circumstances described above, Defendants should not, in good conscience, be able to retain any interest in the Protected Information and any BAI Bon Aqua units that Defendants have in their possession.

97.     Plaintiffs seek from this Court the imposition of a constructive trust for the benefit of Plaintiffs in all of the Protected Information and any BAI Bon Aqua units, as well as any proceeds of the same.

## NINTH CLAIM FOR RELIEF
### (Civil Conspiracy)

98.     Plaintiffs repeat and reallege Paragraphs 1 through 97 of the Complaint as if repeated and realleged herein.

99.     At all relevant times, Defendants knew that they were in a position of trust and confidence with Plaintiffs.

100.    At all relevant times, Defendants knew that Plaintiffs were relying upon Defendants' misrepresentations.

101.    Defendants conspired and agreed with each other to effectuate the Scheme and to take actions in furtherance thereof.

20

102. As a result of the acts and omissions of Defendants as alleged herein, Plaintiffs have suffered damages in excess of $10,000.00, and are entitled to recover such damages from Defendants, jointly and severally.

**TENTH CLAIM FOR RELIEF**
**(Unfair Competition)**

103. Plaintiffs repeat and reallege Paragraphs 1 through 102 of the Complaint as if repeated and realleged herein.

104. The acts of Defendants as alleged herein, including: (a) advertising that its so-called "WRAP" is identical and/or better than the BAI system; (b) taking advantage of the goodwill and business reputation of BAI by unfair means; (c) selling BAI units and/or doing business as BAI; and (d) palming off the so-called "WRAP" system as the business of BAI, all constitute unfair competition.

105. As a result of Defendants' unfair competition, Plaintiffs have suffered and will continue to suffer monetary damages and immediate and irreparable harm, including permanent and irreparable damage to their reputation and business, which damage is not compensable by money damages alone.

WHEREFORE, Plaintiffs respectfully request that:

1. Plaintiffs have and recover from Defendants, jointly and severally, actual, incidental, and consequential damages in an amount in excess of $10,000.00;

2. The Court temporarily, preliminarily and permanently enjoin Defendants as requested in the Seventh Claim for Relief;

3. That any damages awarded pursuant to Chapter 75 be trebled;

21

4.      This Court impose a constructive trust for the benefit of Plaintiffs in all of the

        Protected Information and BAI Bon Aqua units, as well as any proceeds of the

        same;

5.      The costs of this action, including reasonable attorney's fees, as allowed by law,

        be taxed against Defendants;

6.      That a jury trial be had on all issues so triable; and

7.      That the Court award Plaintiffs such other and further relief as to the Court may

        seem just and proper.

This the 19th day of February, 2010.

_____
        Amiel J. Rossabi
        *Attorney for Plaintiffs*


OF COUNSEL:

FORMAN ROSSABI BLACK, P.A.
3623 North Elm Street, Suite 200
Post Office Box 41027
Greensboro, North Carolina  27404-1027
Telephone:  (336) 378-1899

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **AMENDED VERIFIED COMPLAINT** was duly served upon all parties listed below in accordance with the provisions of Rule 5 of the North Carolina Rules of Civil Procedure by: (1) electronic mail; and (2) depositing it in the United States Mail, first-class postage prepaid, addressed as follows:

> Mack Sperling, Esq.
> BROOKS PIERCE MCLENDON
> HUMPHREY & LEONARD
> Post Office Box 26000
> Greensboro, North Carolina 27420
> MSPERLING@brookspierce.com

This the 19th day of February, 2010.

Amiel J. Rossabi

23

STATE OF NORTH CAROLINA

GUILFORD COUNTY

**VERIFICATION**

GERALD H. LOWENSTEIN, in his capacity as Chief Executive Officer of Bon Aqua

International, Inc., being first duly sworn, deposes and says that he has read the **AMENDED**

**VERIFIED COMPLAINT** and knows the contents thereof, and that the same are true of his

own knowledge, except those matters and things stated therein on information and belief, and as

to those matters and things he believes them to be true.

This the 19th day of February, 2010.

_____

GERALD H. LOWENSTEIN, in his capacity as
Chief Executive Officer of BON AQUA
INTERNATIONAL, INC.

Sworn to and subscribed before me,

this the 19th day of February, 2010.

_____
Notary Public

My Commission Expires: 2/20/2014

KARON E. MORRISON
NOTARY
PUBLIC
FORSYTH COUNTY, NC

STATE OF NORTH CAROLINA

GUILFORD COUNTY

**VERIFICATION**

GERALD H. LOWENSTEIN, being first duly sworn, deposes and says that he has read

the **AMENDED VERIFIED COMPLAINT** and knows the contents thereof, and that the same

are true of his own knowledge, except those matters and things stated therein on information and

belief, and as to those matters and things he believes them to be true.

This the 19th day of February, 2010.

_____
GERALD H. LOWENSTEIN

Sworn to and subscribed before me,

this the 19th day of February, 2010.

_____
Notary Public

My Commission Expires: 2/20/2014

STATE OF NORTH CAROLINA

**VERIFICATION**

GUILFORD COUNTY

      CONSTANCE C. LOWENSTEIN, being first duly sworn, deposes and says that she has read the **AMENDED VERIFIED COMPLAINT** and knows the contents thereof, and that the same are true of her own knowledge, except those matters and things stated therein on information and belief, and as to those matters and things she believes them to be true.

      This the 19th day of February, 2010.

                        _Constance C. Lowenstein_

                        CONSTANCE C. LOWENSTEIN

Sworn to and subscribed before me,

this the 19th day of February, 2010.

_____
Notary Public

My Commission Expires: 2/28/2014

KARON E. MORRISON
NOTARY PUBLIC
FORSYTH COUNTY, NC

From: "Chuck Alexander" <chuck@josephcharlesinc.com>
Subject: **Various information**
Date: May 1, 2009 10:31:41 AM EDT
To: "'Bon Aqua Intl, Inc.'" <bai2@bonaqua.com>
Cc: "'Rodney Shaffer'" <rodneyshaffer@comcast.net>

Good Morning Jerry!

Thank you for sending me the shrimp notes from the local fish monger, it was very interesting and I may try and visit his stand this weekend. The other e-mail that you sent me about the CDC in Atlanta, I wasn't able to open, and therefore didn't get the full effect of the intended humor.

The following two websites are the businesses that I was telling you and Connie about on Wednesday. The first, is the place I worked at in Ann Arbor, MI, and the second is my brother's business in Chapel Hill. I know you would enjoy both places immensely. Please take a look at these websites, and next time y'all are in Chapel Hill please visit my brother's store.

www.zingermans.com
www.3cups.net

Next, I wanted to provide you with a few companies/organizations we are hoping to work with in '09 in the Bon Aqua world. Rodney and I have talked about most of these connections at some time over the last month, but I wanted to give them to you again so they are fresh in your mind.

- CB Richard Ellis – large national property management company (Joe & Doug)
- Northmarq – large national property management company (Rodney). Referral from Doug
- Servidyne – Rodney (referral from Doug)
- Google (Rodney)
- Colliers Spectrum Cauble (Rodney)
- Transwestern (Rodney)
- JC Penny – Joe
- American Airlines – Joe
- Sears – Joe & Doug
- Freudenburg – Textiles – Chris Hargett
- PTI Airport – Chris Hargett
- Fort Bragg – Joe & Chris

I will update this list as new things arise, and hopefully we'll have some proposals/ROI's coming across your desk very soon.

I hope y'all have a great weekend and keep me posted on Mylan. Also, it is May 1, so I think a call

to Paul Holt shouldn't be ruled out, but just use your best judgment as to when to call....maybe next week? Thanks for everything and I will talk to you soon!

Best Regards,
Chuck

# SALES AGENCY AGREEMENT

Joseph Charles, L.L.C. (JC) has expressed a desire to represent Bon Aqua International, Inc. (BAI) for the sale, installation and service of Bon Aqua water treatment products. Following are the terms and conditions of this agreement between BAI and JC.

BAI will provide JC with training, sales assistance and technical support in order to assure the accurate procedure necessary for sales of the Bon Aqua technology. BAI will also provide a 25 year product warranty, a one year money-back performance guarantee, and a one year product liability insurance certificate to all end users of the Bon Aqua product sold by JC.

BAI shall also supply brochures, DVDs and CDs at a nominal charge. BAI will initially provide proposals and ROIs, and will train JC to produce their own proposals and ROIs. All proposals and ROIs are to be reviewed by BAI prior to delivery of same to client. JC is responsible for the sales presentation, facility survey, installation and follow up service with their clients. Any payment arrangements other than outright purchase must be approved by BAI prior to presentation to client.

A commission rate of 40% will be paid to JC for Bon Aqua products sold within the United States of America by JC. The commission will be paid upon receipt of payment from client. BAI will provide the client with the warranty, guarantee and insurance certificate within ten days after receipt of final payment.

Joseph Charles has no territorial limitation, but will provide BAI with a list of all prospective clients in order to avoid a duplication of efforts from other BA representatives and re-sellers in the US.

## INTERNATIONAL PURCHASING RIGHTS AGREEMENTS

All international purchasing rights agreements are subject to the terms of the attached contract. BAI will pay JC a 40% commission on all sums over the initial $50,000 investment and $70 per unit charge. Commission for international agreements will be paid to JC upon receipt of final payment from international distributor.

BAI shall have the right to terminate all agreements with JC for just cause. Just cause is defined as JC knowingly misrepresenting the Bon Aqua product or becomes insolvent. These agreements will remain in effect for a period of three years, and may be renewed upon mutual consent of BAI and JC.

Signed this 25th day of April, 2008.

For Bon Aqua International, Inc.

_____
Gerald H. Lowenstein

For Joseph Charles, LLC

_____
Joseph Nazario

_____
Connie Lowenstein

_____
Chuck Alexander

Confidentiality Agreement

It is understood and agreed to that the below identified discloser of confidential information may provide certain information that is and must be kept confidential. To ensure the protection of such information, and to preserve any confidentiality necessary under patent and/or trade secret laws, it is agreed that

1. The Confidential Information to be disclosed can be described as and includes:

*All technical and business information relating to Bon Aqua International water treatment products including but not limited to, the manufacturing process, ideas, patentable ideas, trade secrets, proprietary ideas and inventions, drawings and/or illustrations, patent searches, existing and/or contemplated products and services, research and development, production, costs, profit and margin information, finances and financial projections, marketing, and current or future business plans and models, regardless of whether such information is designated as "Confidential Information" at the time of its disclosure.*

2. This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Recipient any rights, license or authority in or to the information exchanged, except the limited right to use Confidential Information specified in paragraph 2. Furthermore and specifically, no license or conveyance of any intellectual property rights is granted or implied by this Agreement.

3. The Recipient agrees not to disclose the confidential information obtained from the discloser to anyone unless required to do so by law.

4. This Agreement states the entire agreement between the parties concerning the disclosure of Confidential Information. Any addition or modification to this Agreement must be made in writing and signed by the parties.

5. If any of the provisions of this Agreement are found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provision(s) shall be deemed modified to the limited extent required to permit enforcement of the Agreement as a whole.

Initial _G_ _6/2/08_                    Initial _MMR_ _6/2/08_

WHEREFORE, the parties acknowledge that they have read and understand this Agreement and voluntarily accept the duties and obligations set forth herein.

Recipient of Confidential Information: Joseph Charles, L.L.C.

By Its Representative: Joseph Nazario

Signature: _____

Date: 6/2/08

By Its Representative: Charles Alexander

Signature: _Charles M. Alexander_

Date: 6/2/08

Discloser of Confidential Information: Bon Aqua International, Inc.

By Its Representative: Gerald H. Lowenstein

Signature: _____

Date: _____

By Its Representative: Constance Lowenstein

Signature: _C Lowenstein_

Date: 6/2/08

## Option Agreement

This option Agreement is made 6 / 2 _____, 2008. By and Among Bon Aqua International (BAI), Aquadyne Inc. and Joseph Charles, LLC (JC).

1. **Options**: Bon Aqua grants Joseph Charles an option to Purchase Bon Aqua International and Aquadyne, which includes trademarks, copyrighted materials, know-how, systems, and procedures from Gerald and Constance Lowenstein on the following terms and conditions:

2. **Purchase Price**: **IF** JC sells 10,000 Bon Aqua units at an average price of $500 per unit or generates $5,000,000.00 in revenue (from all sources) during a twenty-four (24) month period ("option period") beginning with the signing of this agreement, **THEN** JC can purchase (80%) interest in Bon Aqua International, Inc., and (100%) in Aquadyne, Inc. for an additional $1 million dollars ($1,000,000.00). All funds disbursed to BAI from JC as well as any BA assets prior to the date of the 1 million dollar purchase shall be excluded from the ownership rights of JC. JC can execute this purchase option at any time during the option period as long as JC has met the requirements to exercise the purchase option. Upon execution of this option, the current BAI owners (Gerald and Constance Lowenstein) will retain a 20% interest in Bon Aqua International until and unless they elect to sell this interest at some unspecified future date.

3. **Options Term**: The term of this option is for a period of twenty-four (24) months beginning on the date that this document is signed. After meeting its performance requirements, JC may exercise this Option at any time during the term by delivering written notice to BAI and tendering the full amount of the purchase price to BAI.

4. **BAI Operations**: During the option period, BAI will continue its normal sales activities using its existing sales reps, selling to organizations such as the Hospital Corporation of America and the University of North Carolina system. JC will not receive any credit for these units sold unless JC personnel assist with the sales efforts and BAI acknowledges this assistance in writing. **Regular BAI operations will not be affected during the option period.** Through the use of a BAI "active client list", JC will assure BAI that no personnel associated with JC will knowingly sell to any company that is currently being served by another BAI salesperson. If an overlap is discovered JC and BAI will come to an agreement that will best serve the client first without compromising the integrity of the salesperson(s), BAI, or JC.

5. **Distribution Agreement**: Joseph Charles will place orders using its own funds, for 2,500 Bon Aqua units to start at the standard unit cost of $36.00. JC will receive the Bon Aqua units and store these units at the JC offices

for JC personnel to sell. At no time will Joseph Charles, LLC be considered a "reseller" and will retain all warranties and guarantees associated with the Bon Aqua unit. The existing commissioned sales relationship between JC and Bon Aqua International will continue, with JC receiving 40% of the revenue and Bon Aqua International receiving 60% of the revenue resulting from sales of Bon Aqua units or exclusive purchasing rights agreements procured by JC personnel and agents contracted via JC. All reselling contracts (including overseas) whether from exclusive purchasing rights agreements and/or sale of Bon Aqua units must be approved by BAI.

During the option period after JC has sold the first 2,000 units, JC will place orders for another 2,500 Bon Aqua units at the then prevailing cost, and the commissioned sales relationship will remain in effect. This cycle will continue until either 10,000 Bon Aqua units are sold or $5,000,000.00 in revenue has been generated by JC sales and marketing activities. BAI will guarantee that all 10,000 units ordered will be delivered no more than twelve (12) weeks from each respective order date. Any delay beyond the twelve-week period will cause the option period (defined above) to be extended by the number of days of delay of the product delivery.

6. **No Shop:** During the option period, BAI will not accept offers from any other entity to purchase an ownership interest in BAI. JC has the exclusive right to purchase a controlling (80%) interest in BAI during the option period, but only if JC meets the requirements specified herein.

During the option period, all new Bon Aqua customers who call BAI directly or contact BAI through the Bon Aqua website must identify how they learned about the Bon Aqua product. If the new customer learned about the product through the sales and marketing efforts of JC, then any product sold to the customer will be delivered from the "inventoried units" ordered by JC and credited to the total quantity sold by JC during the option period.

7. **Divestiture:** The terms above are dependent on BAI's reacquisition of any and all stock currently owned by shareholders other than Gerald and Constance Lowenstein. BAI further agrees not to sell any ownership interest in BAI to any entity other than JC if all conditions of this option agreement are met by JC within the stated twenty-four month timeframe. JC agrees to recognize and honor all agreements existing in place with any sales personnel, distributors, and dealers.

Until BAI has completed its reacquisition of any and all stock currently owned by shareholders other than Gerald and Constance Lowenstein, the parties hereby agree to be bound by the following terms:

- BAI will pay JC a commission of 40% of gross sales revenues (as per the existing sales agreement between the two parties) until JC has generated $5 million ($5,000,000) of total revenues.
- JC will place orders for 10,000 BA units, 2,500 units at a time as per the "Option Term Agreement" section of this document. These units will be inventoried by JC, but will be owned by BAI until sold. All commissions will be paid upon receipt of paid invoice from the customer. All terms of the Distribution Agreement section of this document will be applicable in the event that the reacquisition has not legally occurred.
- If JC generates $5 million in total sales revenue before the end of the Option Term, BAI will then pay JC a commission of 60% on all revenues generated by JC through the sale of Bon Aqua units, reseller rights, or exclusive purchasing rights agreements for the ensuing twenty-four (24) months ("60% Term") commencing on the date by which JC will have generated $5 million in total sales revenue.
- At the end of the 60% Term:
  - BAI will then pay JC a commission of 80% on all revenue generated by JC through the sale of Bon Aqua units, reseller rights, or any exclusive purchasing rights agreements.

**8. Effect on Heirs and Successors:** This agreement and each of its provisions shall be binding on and shall inure to the benefit of the respective heirs, devisees, legatees, executors, administrators, trustees, successors, and assignees of the parties to this agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as a sealed instrument, as of ___6 / 2___, 2008.

_____
GERALD H. LOWENSTEIN

_____
CONSTANCE C. LOWENSTEIN


**BON AQUA INTERNATIONAL, INC.**

(corporate seal)

By _____
GERALD H. LOWENSTEIN, President

ATTEST:
_____
CONSTANCE C. LOWENSTEIN,
Secretary


**AQUADYNE, INC.**

(corporate seal)

By _____
GERALD H. LOWENSTEIN, President

ATTEST:
_____
CONSTANCE C. LOWENSTEIN,
Secretary

**JOSEPH CHARLES, LLC**

_____

_____

By _____  6/2/08
JOSEPH NAZARIO, Member/Manager


By _____
CHARLES ALEXANDER, Member/Manager

Network Solutions >> Whois >> Results
Log In

# ℕ WebAddress℠

- Search
- Renew
- Transfer
- Features
- Private Registration
- Forward
- WHOIS

# WHOIS Results

**You Searched for:** secondearthinc.com

Get this domain with an alternate extension now!

☐ ☐ ☐ ☐
.net.org.biz.bz .eu

**Add Selected to Cart**

WHOIS results for secondearthinc.com

IMAGE NOT
AVAILABLE

⚙ BOOKMARK ▪ ۞ ₽ ⌐

```
The data contained in GoDaddy.com, Inc.'s WhoIs database,
while believed by the company to be reliable, is provided "as
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration recor
Any use of this data for any other purpose is expressly forbi
permission of GoDaddy.com, Inc.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty
you agree not to use this data to allow, enable, or otherwise
dissemination or collection of this data, in part or in its e
purpose, such as the transmission of unsolicited advertising
and solicitations of any kind, including spam.  You further a
not to use this data to enable high volume, automated or robo
processes designed to collect or compile this data for any pu
including mining this data for your own personal or commercia

Please note: the registrant of the domain name is specified
in the "registrant" field.  In most cases, GoDaddy.com, Inc.
is not the registrant of domain names listed in this database
```

```
Registrant:
    Chuck Alexander
    2 Terrace Way
    Suite C
    Greensboro, North Carolina 27403
    United States

    Registered through: GoDaddy.com, Inc. (http://www.godaddy.
    Domain Name: SECONDEARTHINC.COM
        Created on: 20-Mar-09
        Expires on: 20-Mar-10
        Last Updated on: 28-Aug-09

    Administrative Contact:
        Alexander, Chuck   chuck@josephcharlesinc.com
        2 Terrace Way
        Suite C
        Greensboro, North Carolina 27403
        United States
        (336) 834-0570      Fax --

    Technical Contact:
        Alexander, Chuck   chuck@josephcharlesinc.com
        2 Terrace Way
        Suite C
        Greensboro, North Carolina 27403
        United States
        (336) 834-0570      Fax --

    Domain servers in listed order:
        DNS1.DYNAMICQUEST.COM
        DNS2.DYNAMICQUEST.COM
        DNS3.DYNAMICQUEST.COM
        DNS4.DYNAMICQUEST.COM
```

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record

| | |
|---|---|
| **Current Registrar:** | GODADDY.COM, INC. |
| **IP Address:** | 74.202.150.139 (ARIN & RIPE IP search) |
| **IP Location:** | US(UNITED STATES)-NORTH CAROLINA-GREENSBORO |
| **Lock Status:** | clientDeleteProhibited |
| **DMOZ** | no listings |
| **Y! Directory:** | see listings |
| **Data as of:** | 23-Apr-2008 |

Make an instant, anonymous offer to the current domain registrant. Learn More



Case 1:10-cv-00169-CCE-LPA   Document 7   Filed 03/02/10   Page 37 of 86

Ok we have to do this in stages

1. here is an option agreement that outlines the contract that will be drawn up for closing
2. I need your signatures on this asap we will then send it to a law firm to have a final contract drawn up for closing. We are paying a third party lawyer to draw this up for your comfort. Bob will not draw up the closing contract.
3. What I did was have the section added that states you can reclaim if payment is not made yada yada (yada is a legal term (haha)) so you should be covered there.

There is one thing that I screwed up a little it was in the short term we could not support the shortening of the deal and the payments. Until we get the second round in place which will take about 5 to six months so I had to decrease the short term. Or we can make the initial payment of 250,000 smaller we can add back the monthly. I did not think this would be a big issue as per our conversation.

A few things upon closing

1. You stated to me you had 200 regular Bon Aqua's and 400 mini Bon Aqua's. We need to collect those upon closing we have stated them to the bank as part of the assets.
2. So when it comes to the later sales agreement we need to do when you sell the pharmaceutical or the city buildings we will need for you to purchase those from us at the 40 dollar cost ( I did not think this would be an issue either considering the profits involved) but we need to assume the assets upon closing and resell them per say when you close on your deals

Let me know when I can come by in the a.m. to pick this up so I can have the closing document executed. The sooner I can get that done the sooner you can get it to your lawyer the sooner we can get this closed. As you can see by the document it is dated no later than Friday so that should let you know I am serious about getting this done this week and time is of the essence.

Thank you, have a great night. I will be in meetings for most of the night just let me know when I can swing by to pick this up. Please shoot me an e-mail so I can see it on my blackberry and adjust tomorrow accordingly.

Hope all is well

Joseph Nazario
Second Earth INC.

Bon Aqua International
Creative one LLC

336-215-0441 mobile
336-834-0570 office
336-834-0571 fax

joe@secondearthinc.com
www.secondearthinc.com





OPTION TO ...ocx (14.3 KB)

## Bon Aqua Intl, Inc.

**From:** joe@secondearthinc.com
**Sent:** Friday, November 06, 2009 2:37 PM
**To:** GERALD H. LOWENSTEIN
**Subject:** Re: happy friday

I tried to call but screwed up your new number. I will call you monday I have a full schedule but I will see if I can move some things around. But for now let's set up tuesday and I will try to do monday late afternoon around 3.30 if that will work? Let me know and what time tuesday works as well as a primary. I called your old number and it did not give me a forwarding number so that was that.

Have a great weekend

Sent from my Verizon Wireless BlackBerry

---

**From:** "Bon Aqua Intl, Inc." <bai2@bonaqua.com>
**Date:** Fri, 6 Nov 2009 14:00:22 -0500
**To:** Joe Nazario<joe@secondearthinc.com>
**Subject:** Re: happy friday

Hey Joe,

With news like this I would think you'd call, but I guess an email will suffice.  It's always good to hear great news no matter how it's delivered!  We will make ourselves available Tuesday, but it would be better for us if we could make it Monday instead.

Let me know.

Thanks,

C
----- Original Message -----
**From:** Joe Nazario
**To:** bai2@bonaqua.com
**Sent:** Friday, November 06, 2009 1:10 PM
**Subject:** happy friday

Hope all is well with the both of you.

Good news, I think we have something now I was wondering if you have time Tuesday to get together say around lunch or later. If we can come to a basic agreement then I can get you a deposit check as we talked about for 250,000 by the following week then we can work up the details after.

Hope your Friday is going well have a great weekend and let me know about Tuesday

Thank you

Joseph Nazario
Second Earth INC.
Bon Aqua International
Creative one LLC

336-215-0441 mobile
336-834-0570 office

336-834-0571 fax

joe@secondearthinc.com
www.secondearthinc.com

# LETTER OF INTENT TO PURCHASE BON AQUA INTERNATIONAL, INC. AND AQUADYNE, INC.

**Parties to the Agreement:** Gerald H. Lowenstein, Constance C. Lowenstein, Bon Aqua International, Inc. and Aquadyne, Inc. (hereinafter referred to as the "**Lowenstein's**") and **Second Earth, Inc.**

**Modification of Prior Agreement(s):** All written and oral Agreements between the Lowenstein's and Joseph Charles, LLC, Joseph F. Nazario and Charles Alexander, including, but not limited to, the **Option Agreement** dated June 2, 2008, are hereby superceded and replaced by this document and all prior terms are null and void.

   **Now Therefore,** Second Earth, Inc. wishing to purchase, and the Lowenstein's wishing to sell, all of the assets of Bon Aqua International, Inc., and Aquadyne, Inc., the parties agree as follows:

**Option:** The Lowenstein's hereby grant to Second Earth, Inc. the exclusive right to purchase 100% of the assets of Bon Aqua International, Inc., and Aquadyne, Inc., including, but not limited to, patents, trademarks, copyrighted materials, trade secrets, drawings, designs, information regarding product development and manufacture, know-how, inventory, systems, and procedures (hereinafter the "assets").

**Term:** This Option shall run from the date of this Agreement through November 13, 2009.

**Purchase Price:** Second Earth, Inc. will pay to the Lowenstein's at closing the sum of Two-Hundred Fifty Thousand Dollars ($250,000.00) for the assets of Bon Aqua International, Inc., and Aquadyne, Inc.

**Asset Transfer:** The Lowenstein's will take all action necessary to effect the transfer of all assets of Bon Aqua International, Inc., and Aquadyne, Inc., to Second Earth, Inc. at closing.

**No Shop:** During the Option Period, Second Earth, Inc. has the exclusive right to purchase a 100% interest in Bon Aqua International, Inc., and Aquadyne, Inc., and the Lowenstein's will not solicit or accept offers from any other entity to acquire any such interest therein.

**Noncompetition:** During the Option Period, Consulting Period and for a period of five (5) years thereafter, the Lowenstein's agree that they will not become associated with any entity, whether as a principal, partner, employee, consultant, shareholder or otherwise, that is engaged in, or desires to be engaged in, any business which is in competition with Second Earth, Inc.

**Consulting Agreement:** The parties recognize that following closing the involvement and

participation of the Lowenstein's may be necessary to effect a smooth transition of business activities, and the Lowenstein's therefore agree to provide consulting services to Second Earth, Inc. for a period of seventy-two (72) months commencing December 15, 2010. Second Earth, Inc. will, commencing January 15, 2010, paCommencing January 15, 2010, Second Earth will pay to the Lowenstein's a monthly consulting fee of Eleven Thousand Eight-Hundred Five Dollars and 55/00 ($11,805.55) for a period of seventy-two (72) months. y to the Lowenstein's a monthly consulting fee. The fee will be Seven Thousand Dollars and 00/00 ($7,000.00) per month for the first six months and Eleven Thousand Eight-Hundred Five Dollars and 55/00 ($11,805.55) for a period of sixty-six (66) months thereafter. Such services will be at the request of Joseph F. Nazario, be made upon reasonable notice, at reasonable times, and will not exceed an average of 30 hours per month.

**Failure to Pay:** In the event that Second Earth, Inc. fails to make payments on the consulting contract as agreed herein, the Lowenstein's shall have all rights allowed under the law including the ability to foreclose on the transaction and reclaim all assets sold pursuant to this Agreement.

**Survivability:** This Agreement and each of its provisions shall be binding on and inure to the benefit of the respective heirs, devisees, legatees, executors, administrators, trustees, successors, and assignees of the parties to this Agreement.

**Representation and Warranties:** The Lowenstein's represent and warrant that they own and control 100% of the stock of Bon Aqua International, Inc., and Aquadyne, Inc., and have the legal right to enter into this Agreement.

Joseph F. Nazario represents and warrants that he has the legal right to enter into this Agreement on behalf of Second Earth, Inc.

    **IN WITNESS WHEREOF,** the Parties have executed this Agreement as a sealed instrument, this 10th day of November, 2009.

 

_____
GERALD H. LOWENSTEIN

 

_____
CONSTANCE C. LOWENSTEIN

**BON AQUA INTERNATIONAL, INC.**

 

_____

By: _____
    Gerald H. Lowenstein, President

**AQUADYNE, INC.**

By: _____
      Gerald H. Lowenstein, President

Subscribed and Sworn to this ____ day of November, 2009, by Gerald H. Lowenstein and Constance C. Lowenstein.

_____

Notary Public, State of North Carolina

**SECOND EARTH, INC.**

By: _____
      Joseph F. Nazario, COO

Subscribed and Sworn to this ____ day of November, 2009, by Joseph F. Nazario.

_____

Notary Public, State of North Carolina

November ___, 2009

Mr. Joseph Nazario
Second Earth, Inc.
Address

*Subject: Letter of Intent for Purchase of Certain Intangible Assets Belonging to
Constance C. Lowenstein and Gerald H. Lowenstein*

Dear Mr. Nazario:

Constance C. Lowenstein and Gerald H. Lowenstein (collectively the "Lowensteins") are
presently negotiating the sale to Second Earth, Inc. ("Buyer") of certain copyrighted
intangible assets belonging to them, but used by Bon Aqua International, Inc. in the
conduct of its business (the "Lowenstein Assets"). Such sale is in conjunction with the
sale by Bon Aqua International, Inc. to Buyer of the tangible and intangible assets of Bon
Aqua International, Inc., including but not limited to, all intellectual property rights
presently held by Bon Aqua International, Inc. (the "Bon Aqua Assets"), such sale to be
documented in a corresponding Letter of Intent and succeeding Agreement. This Letter
of Intent is a non-binding agreement between Buyer and the Lowensteins, and the final
terms and conditions of the formal agreement remain to be settled. In contemplation of
the execution of a succeeding formal agreement, this Letter of Intent serves as an interim
agreement between Buyer and the Lowensteins.

This Letter of Intent contemplates that the parties will negotiate in good faith a definitive
sale and purchase agreement (the "Agreement") by not later than December 2, 2009. It is
the intent of the parties that the parties begin preparation of said Agreement by November
18, 2009. This Letter of Intent is being entered into to confirm the parties' agreement on
certain terms and conditions as set forth on Attachment A to this Letter of Intent and a
corresponding Letter of Intent to purchase the Bon Aqua Assets, and their mutual
willingness to proceed in mutual good faith to work toward the definitive Agreement(s)
consistent with these terms.

This Letter of Intent expires on December 2, 2009, unless on or before that date:

1.  Buyer and the Lowensteins execute a formal agreement for Buyer's purchase of
    the Lowenstein Assets, AND Buyer and Bon Aqua International, Inc. execute a
    formal agreement for Buyer's purchase of the Bon Aqua Assets;
2.  The parties change the above expiration date to a mutually agreeable date; or
3.  The parties are unable to reach agreement on the final terms and conditions of the
    sale and purchase and agree to terminate this Letter of Intent.

If this Letter of Intent expires or is terminated as stated above, the corresponding Letter
of Intent between the parties to purchase the Bon Aqua Assets shall be deemed to have
expired or have been terminated concurrent with the expiration or termination of this
Letter of Intent.

Buyer Initials _____    Lowenstein Initials _____ _____

November ___, 2009

Mr. Joseph Nazario
Second Earth, Inc.
Address

*Subject: Letter of Intent for Purchase of Intangible and Tangible Assets of Bon Aqua International, Inc.*

Dear Mr. Nazario:

Bon Aqua International, Inc. ( "Seller") and Second Earth, Inc. ("Buyer") are presently negotiating a formal agreement for the sale of the tangible and intangible assets of Seller to Buyer, including but not limited to, all intellectual property rights presently held by Seller (the "Bon Aqua Assets"). Such sale is in conjunction with the sale by Constance C. Lowenstein and Gerald H. Lowenstein (collectively the "Lowensteins") to Buyer of certain copyrighted intangible assets belonging to them, but used by Seller in the conduct of its business (the "Lowenstein Assets"). This Letter of Intent is a non-binding agreement between Seller and Buyer, and the final terms and conditions of the formal agreement remain to be settled. In contemplation of the execution of a formal agreement, this Letter of Intent serves as an interim agreement between Buyer and Seller.

This Letter of Intent contemplates that the parties will negotiate in good faith the definitive sale and purchase agreement (the "Agreement") by not later than December 2, 2009. It is the intent of the parties that the parties begin preparation of the Agreement by November 18, 2009. This Letter of Intent is being entered into to confirm the parties' agreement on certain terms and conditions as set forth on Attachment A to this Letter of Intent and the corresponding Letter of Intent to purchase the Lowenstein Assets, and their mutual willingness to proceed in mutual good faith to work toward the definitive Agreement(s) consistent with these terms.

This Letter of Intent expires on December 2, 2009, unless on or before that date:

1.  Buyer and Seller execute a formal agreement for Buyer's purchase of the Bon Aqua Assets, AND Buyer and the Lowensteins execute a formal Agreement for Buyer's purchase of the Lowenstein Assets;
2.  The parties change the above expiration date to a mutually agreeable date; or
3.  The parties are unable to reach agreement on the final terms and conditions of the sale and purchase and agree to terminate this Letter of Intent.

If this Letter of Intent expires or is terminated as stated above, the corresponding Letter of Intent between the parties to purchase the Bon Aqua Assets shall be deemed to have expired or have been terminated concurrent with the expiration or termination of this Letter of Intent.

Buyer Initials _____     Seller Initials _____     Lowenstein Initials _____ _____

The Lowensteins, Bon Aqua International, Inc. and Buyer have presently entered into an Option Agreement dated June 2, 2008 and set to terminate June 2, 2010. To the extent there are differences between this Letter of Intent and the Letter of Intent to purchase the Bon Aqua Assets, as opposed to that Option Agreement, the Letters of Intent, while in effect, shall control. In the event the Letters of Intent are terminated, the Option Agreement shall remain in place until the date of its scheduled termination.

If and when the succeeding Agreements to be negotiated are signed by the parties, neither party shall have any continuing obligations under either Letter of Intent or under the Option Agreement, as all former agreements will be superseded by the terms and conditions of the succeeding Agreements. The succeeding Agreements shall govern the entire transaction from the beginning.

If the foregoing correctly sets forth the understanding of the parties, please sign this Letter of Intent at the place provided below and return to the undersigned.

_____
Gerald H. Lowenstein, Individually

_____
Constance C. Lowenstein, Individually

Accepted:

SECOND EARTH, INC.

By: _____
       Joseph Nazario, _____
Title: _____

Date: _____

# ATTACHMENT A
## PRINCIPAL TERMS AND CONDITIONS

<u>Seller Assets to Be Purchased</u> – All right, title and interest in all of the physical assets of Seller including, but not limited to, furniture, equipment, and inventory except as set forth in "Retention of Certain Physical Units" below), including but not limited to, two hundred mini Bon Aqua units presently held by Seller. All right, title, and interest in all customer lists and goodwill belonging to Seller. Buyer acknowledges that Seller holds neither patents nor trademarks relating to the Bon Aqua Assets to be purchased.

<u>Payment and Payment Terms</u> – The total payment for the Bon Aqua Assets shall be One Hundred Fifty Thousand Dollars ($150,000.00). Buyer shall make full payment for the Bon Aqua Assets on the date of Closing.

<u>Transfer of Ownership of Assets</u> -- Although payment in full for the Bon Aqua Assets shall be made at Closing, because of the intertwined nature of the Bon Aqua Assets and the Lowenstein Assets, Seller shall retain all right, title and interest to the Bon Aqua Assets until such time as payment in full is made by Buyer for the Lowenstein Assets. Physical custody of the tangible Bon Aqua assets shall be transferred to Seller at Closing. During the period of time beginning at Closing and ending upon full payment by Buyer, Seller shall grant to Buyer a sole and exclusive license to use for purposes of manufacture and sale of product, all intellectual property included as part of the Seller Assets as long as Buyer is not in default under this Letter of Intent or any succeeding Agreement. Upon full payment of the purchase price for the Lowenstein Assets, all title and interest in these assets shall be granted to Buyer, and Seller agrees to assist in any steps necessary to accomplish the transference of title and ownership.

<u>Retention of Certain Physical Units</u> – Buyer recognizes that Seller has some outstanding obligations to certain customers, namely Mylan Pharmaceuticals and the City of Raleigh, under agreements signed prior to the signing of this Letter of Intent. Seller shall have the right to retain sufficient units of the Bon Aqua product to satisfy these two obligations. Seller estimates that the number of units needed is two hundred and will retain title to 200 standard Bon Aqua units at Closing. If Seller needs additional units to satisfy these two obligations, Buyer agrees to sell to Seller such additional units at a price of $40.00 per unit.

<u>Assignment of Distributorship Obligations</u> - Seller shall assign to Buyer at Closing all of its rights and obligations under distributorship agreements with Tri-Aqua, LLC. and Bon Aqua Central America entered into by Seller prior to the initiation of this Letter of Intent. Seller agrees to such assignment subject to Seller's review of said distributorship agreements. Seller understands that Buyer is obligated under these agreements and thus, the assignment is a requirement of the sale of both the Bon Aqua Assets and Lowenstein Assets to Buyer.

<u>Consulting Assistance</u> -- As a part of the consideration for the purchase of the Bon Aqua Assets, and as long as Buyer is not in default under this Letter of Intent or any succeeding

Buyer Initials _____    Seller Initials _____    Lowenstein Initials _____ _____

Agreement, the Lowensteins agree to provide, for a period of two (2) years following the Closing, consulting services to Buyer to assist in the transition of the business to Buyer. Gerald Lowenstein agrees to provide, free of charge, to Buyer a maximum of ten (10) hours per month of consulting services. Any services required over ten hours in a given month shall be provided at a charge of Two Hundred Dollars ($200.00) per hour. Buyer agrees to pay all travel and living expenses incurred by the Lowensteins in providing both the free and chargeable consulting services.

No Shop – During the period in which this Letter of Intent is effective, Seller and the Lowensteins personally agree that Buyer has the exclusive right to purchase the Bon Aqua Assets and Lowenstein Assets listed in this Letter of Intent and/or the Bon Aqua Letter of Intent. As long as Buyer is not in default of any of the provisions of either Letter of Intent or any succeeding Agreement(s), neither Seller nor the Lowensteins will accept or solicit offers from any other entity to acquire any such interest therein.

Non-Competition – During the effective period of this Letter of Intent and the corresponding Letter of Intent to purchase the Lowenstein Assets, and for an additional five (5) years from the date of Closing, as long as Buyer is not in default under either Letter of Intent or any succeeding Agreement(s), the Lowensteins agree that they will not become associated with any entity, whether as a principal, partner, employee, consultant, shareholder or otherwise, that is engaged in, or desires to be engaged in, any business which is in competition with Second Earth, Inc.

Remedies for Buyer's Default – Seller shall be in default under this Letter of Intent or any succeeding Agreement if Seller:
    (a)    fails to make timely payment of any monthly payment due during the Payment Period in the Letter of Intent to Purchase the Lowenstein Assets or its succeeding Agreement, or payment for any consulting services provided under section "Consulting Assistance". Timely payment shall be deemed as any payment made on or before the first day of the month; provided, however, that Buyer shall have a five (5) day grace period from the beginning of each month to provide payment to Seller.
    (b)    takes any action in contradiction of its rights and/or obligations under this Letter of Intent or any succeeding Agreement, including but not limited to, any actions exceeding or attempting to exceed its rights to intellectual property included in the Bon Aqua Assets.
    (c)    makes any false representations or warranties under this Letter of Intent or any Succeeding Agreement.
    (d)    substantially breaches any provision of this Letter of Intent or any succeeding Agreement and fails, upon written notice from Seller, to remedy such breach within ten (10) days of such written notice.
    Buyer's default shall give Seller the right immediately to reclaim all physical assets held by Buyer. In addition, Buyer's sole and exclusive license to use all intellectual property contained in the Bon Aqua Assets shall immediately cease. Buyer shall immediately return all copies, in whatever form, of the intellectual property to Seller. Any obligations of Seller or the Lowensteins under either Letter of Intent or any succeeding Agreements regarding non-competition, non-shop or consulting services shall

Buyer Initials _____ Seller Initials _____ Lowenstein Initials _____ _____

immediately terminate. Buyer shall pay all expenses and costs, including reasonable attorneys' fees, incurred by Seller in recovering the Bon Aqua Assets if Buyer defaults.

Indemnification - Seller hereby agrees to indemnify and hold harmless Buyer, its successors and assigns, against any and all liabilities, losses, damages, costs and expenses, including reasonable attorneys' fees, incurred by Buyer (a "Loss") arising out of any obligation or liability (or threatened obligation or liability) attributable to the pre-Purchase Date operation of its business and use of the Bon Aqua or Lowenstein Assets by Seller. Buyer hereby agrees to indemnify and hold harmless Seller, its successors and assigns against any and all liabilities, losses, damages, costs and expenses, including reasonable attorneys' fees, incurred by Seller (a "Loss") arising out of any obligation or liability (or threatened obligation or liability) attributable to the post-Purchase Date operation of its business and use of the Bon Aqua Assets or the Lowenstein Assets by Buyer. The indemnification obligations contained herein shall survive the Closing.

Product Liability Insurance Transfer - Seller agrees to use reasonable efforts to effect the transfer of its product liability insurance regarding the Bon Aqua Assets to Buyer if Buyer requests the transfer. Seller shall provide to Buyer, upon the signing of this Letter of Intent, a copy of its product liability insurance policy for Buyer's review.

Choice of Law and Arbitration - This Agreement and the parties' performance under it are governed by the law of the State of North Carolina. Any controversy, claim or dispute arising out of or relating to this Agreement, including claims under the Warranty as provided herein, shall be submitted to arbitration in Greensboro, North Carolina in accordance rules and law of the State of North Carolina as set forth in the Revised Uniform Arbitration Act. Judgment upon any award rendered by the arbitrator(s) may be entered in any North Carolina State Court having jurisdiction thereof. Buyer and Seller irrevocably consent to and confer personal jurisdiction upon the courts of the State of North Carolina, and waive any objections to the venue of such courts.

Buyer Initials _____ Seller Initials _____ Lowenstein Initials _____ _____

The parties have presently entered into an Option Agreement dated June 2, 2008 and set to terminate June 2, 2010. To the extent there are differences between this Letter of Intent and the corresponding Letter of Intent to purchase the Lowenstein Assets, as opposed to that Option Agreement, the Letters of Intent, while in effect, shall control. In the event the Letters of Intent are terminated, the Option Agreement shall remain in place until the date of its scheduled termination.

If and when the succeeding Agreements to be negotiated are signed by the parties, neither party shall have any continuing obligations under either Letter of Intent or under the Option Agreement, as all former agreements will be superseded by the terms and conditions of the formal Agreements. The formal Agreements shall govern the entire transaction from the beginning.

If the foregoing correctly sets forth the understanding of the parties, please sign this Letter of Intent at the place provided below and return to the undersigned.

BON AQUA INTERNATIONAL, INC.

By: _____
       Gerald H Lowenstein, President

Accepted:

SECOND EARTH, INC.

By: _____
       Joseph Nazario, _____
Title: _____

Date: _____

Buyer Initials _____    Seller Initials _____    Lowenstein Initials _____ _____

# ATTACHMENT A
## PRINCIPAL TERMS AND CONDITIONS

<u>Lowenstein Assets to Be Purchased</u> –All right, title and interest in Copyright TX- 6-401-857 held by Constance C. Lowenstein. All right, title and interest in Copyrights TX-6-483-800 and TX-3-685-402 held by Gerald H. Lowenstein. All right, title and interest in pending Copyright SR 1-74050771 held by Gerald H. Lowenstein.

<u>Payment and Payment Terms</u> – The total payment for the Lowenstein Assets shall be One Million, Three Hundred Thousand Dollars ($1,300,000.00). Buyer shall make an initial payment to the Lowensteins of One Hundred Thousand Dollars ($100,000.00) on the date of Closing. The remainder of the purchase price shall be made in monthly payments of Twelve Thousand Dollars ($12,000.00) each, plus interest, for a period of a maximum of 100 months, beginning March, 2010 (the "Payment Period"). All payments shall be due on the first of each month during the Payment Period. Buyer may, at its discretion, make prepayments or pay the amount in full prior to the end of the Payment Period. Buyer agrees to execute a promissory note and, if required, a security agreement for the remaining $1,200,000.00.

<u>Transfer of Ownership of Assets</u> – The Lowensteins shall retain all right, title and interest to the Lowenstein Assets until such time as payment in full is made by Buyer. During the period of time beginning at Closing and ending upon full payment by Buyer, the Lowensteins shall grant to Buyer a sole and exclusive license to use for purposes of manufacture and sale of product, all intellectual property included as part of the Lowenstein Assets as long as Buyer is not in default under either Letter of Intent or any succeeding Agreement(s). Upon full payment of the purchase price for the Lowenstein Assets, all title and interest in these assets shall be granted to Buyer, and the Lowensteins agree to assist in any steps necessary to accomplish the transference of title and ownership.

<u>Consulting Assistance</u> – As a part of the consideration for the purchase of the Bon Aqua Assets and Lowenstein Assets, and as long as Buyer is not in default under either Letter of Intent or any succeeding Agreement(s), the Lowensteins agree to provide, for a period of two (2) years following the Closing, consulting services to Buyer to assist in the transition of the business to Buyer. Gerald H. Lowenstein agrees to provide, free of charge, to Buyer a maximum of ten (10) hours per month of consulting services. Any services required over ten hours in a given month shall be provided at a charge of Two Hundred Dollars ($200.00) per hour. Buyer agrees to pay all travel and living expenses incurred by the Lowensteins in providing both the free and chargeable consulting services.

<u>No Shop</u> – During the period in which this Letter of Intent is effective, Bon Aqua International, Inc. and the Lowensteins personally agree that Buyer has the exclusive right to purchase the Bon Aqua Assets and Lowenstein Assets listed in this Letter of Intent and/or the Bon Aqua Letter of Intent. As long as Buyer is not in default of any of the provisions of either Letter of Intent or any succeeding Agreement(s), neither Bon

Buyer Initials _____     Lowenstein Initials _____ _____

# Bon Aqua Intl, Inc.

**From:** Joe Nazario [joe@secondearthinc.com]
**Sent:** Thursday, December 03, 2009 11:02 AM
**To:** Bon Aqua Intl, Inc.
**Subject:** RE: Thursday

Jerry,

Thank you for advising that you did not intend to cancel the Option Agreement. As it stands now I am working through some difficult issues and request that you let me know whether the stock owned by shareholders other than yourself and Connie has been reacquired. If it has not, then please provide the names of the other shareholders."

Joseph Nazario

---

**From:** Bon Aqua Intl, Inc. [mailto:bai2@bonaqua.com]
**Sent:** Thursday, December 03, 2009 10:13 AM
**To:** Joe Nazario
**Cc:** Barbara Stewart, Esq; Chuck Alexander; Shaffer Rodney
**Subject:** Re: Thursday

Joe,

The only thing we withdrew was the Letter of Intent. We clearly view the Option Agreement of 6/2/08 to remain in effect and have no intention of canceling it. We once again request an answer to our email of 12/2/09 as follows:

) Does Joseph Charles intend to continue representing Bon Aqua products?
) If you do wish to continue, we will insist on better communications at regular intervals (yet to be determined).
) To reiterate what has already been discussed and agreed to, all proposals are to be reviewed by BAI prior to presentation to the client; will be sent under the cover of BAI; and any subsequent invoicing for product sold will be done by BAI. A commission of 40% will be paid to Joseph Charles, LLC (JC) immediately upon receipt of full payment from the client.

If you decide to continue as representatives of BAI, we will continue to honor any commitments we have made to JC over the past two years.

Under any circumstance, we request an accounting of the Bon Aqua units in your possession, the ownership of which remains with Bon Aqua International, Inc.(BAI) If you do not desire or intend to represent BAI from this date forward, please make immediate arrangements to deliver the 2200+ units to our offices. As BAI sells those units, JC will be reimbursed the $36 per unit cost plus a 20% interest for the 2200+ units, as well as the 200 units we have in our possession. Additionally, please relinquish all proposals so that we may follow up on them. If BAI completes the sale on any of those proposals, BAI will pay JC a 10% finder's fee.

Thanks again,

Jerry Lowenstein

Dec 2, 2009, at 8:00 PM, Joe Nazario wrote:

Jerry,

you know, since you withdrew your offer to sell Bon Aqua International, I have lost the investor group that I was working with and the financial condition of Joseph Charles is not good. I read your withdrawal of the offer to sell to mean that you have cancelled the Option Agreement of June 2, 2008. If that was your intent, please advise. If you

have not voided the Option Agreement, then please provide me with the names of the shareholders of BAI other than you and Connie as referred to under Paragraph 7 "Divestiture."

Thanks.


Joseph Nazario


Gerald H. Lowenstein, CEO
Bon Aqua International, Inc.
PO Box 19047
Greensboro NC 27419-9047
+888.294.2424 (v)
+800.297.5644 (f)
www.bonaqua.com

## Bon Aqua Intl, Inc.

**From:** Joe Nazario [joe@secondearthinc.com]
**Sent:** Saturday, December 05, 2009 5:38 PM
**To:** Bon Aqua Intl, Inc.
**Subject:** follow up

Jerry,

I will continue to correspond directly to you and you can feel free to share the communications with your attorney as you please.

In response to your e-mail of December 2, 2009, requesting an accounting of the product, as you are aware no product of yours has been sold by Joseph Charles as of this date. Joseph Charles is now insolvent. The company did purchase 2500 units from you at a cost of $93,000.00 which funds were delivered to you and accepted. The first check written on June 12th 2008 for $60,000.00 check number 1543 and the second august 4th 2008 for $33,000.00 check number 1608. Of those units, you have 200 in your possession. We need to resolve disposition of the total units and I offer the following proposal:

1.  BAI is requested to immediately make payment of $93,000.00 and the units in Joseph Charles possession will be returned to you.

2.  Alternatively, if you are unable to make payment for the units, or choose not to do so, please deliver the 200 units (which were purchased by and belong to Joseph "Charles) to me immediately.

Of the two options, I would prefer that you accept the first and immediately reimburse me for the product. Thank you for your prompt attention to this matter. I look forward to hearing from you.

Also in pursuant to paragraph 4 of the Option Agreement, I need you to provide me with a written acknowledgement of all projects where JC personnel assisted BAI with sales efforts.

Thank you.

Joseph Nazario

# Bon Aqua Intl, Inc.

**From:** Bon Aqua [bai2@bonaqua.com]
**Sent:** Monday, December 21, 2009 5:48 PM
**To:** bai5@bonaqua.com
**Subject:** Fw: Bon Aqua Representation


**From:** Bon Aqua
**Sent:** Monday, December 14, 2009 11:10 AM
**To:** joe@secondearthinc.com
**Subject:** Bon Aqua Representation

Joe,

Now that the dust has settled and we've all regained some perspective on this situation, hopefully we can get back to the job at hand. As you know, Jerry's preference would be talking things through, as he is not a fan of email and texting; but I decided that maybe I might have better luck. So here goes.

While I understand that Joseph Charles/Second Earth has no interest in moving forward with the purchase of BAI, I was totally unaware that your sales efforts would cease if the purchase did not go through; nor was there ever any indication that Joseph Charles (JC) would become insolvent and unable to function if the purchase was not culminated. The financial collapse of JC came as a total shock to both of us, and to be perfectly honest, all of the foregoing events have left Jerry and me deeply saddened and more than a little bewildered. It is still quite difficult for me to comprehend that together we were unable to negotiate a better outcome. Realistically, that's the whole purpose of a Letter of Intent. But there is no point regurgitating what was, it's far more important to focus on what can be.

It was never our intent for JC or Second Earth to stop selling. We both felt very positive about the new sales/service approach you were putting together, and felt like it certainly had the potential to increase your chances of success. Everyone was onboard with the same mission in mind. We still feel that way and see no valid reason for that momentum not to continue. It is my fervent hope that you can get back on track and focus your efforts on selling product with the same intensity you had seeking investors. It will certainly help put money back into JC's coffers and into the pockets of the people that believed in you and your abilities.

Joe, I wanted you to have the option of whether the other members of your team are aware of the possibilities that still exist, so in the spirit of cooperation, please think this through and let me know how we can fix this ASAP.

Regards,

Connie

Connie Lowenstein
Bon Aqua International, Inc.
336.323.8336 (v)
888.294.2424 (v)
800.297.5644 (f)
336.312.4474 (c)

of Counsel
Richard C. Forman
Paul E. Marth



## Forman · Rossabi · Black
### A T T O R N E Y S   A T   L A W

Amiel J. Rossabi*
T. Keith Black
James H. Slaughter
Steven E. Black
Emily Jeffords Meister**

Barbara L. Stewart
Theodora A. Vaporis ††
Carole R. Albright
Gavin J. Reardon
Margaret M. Chase
Michael C. Taliercio*
*also licensed in NY
**also licensed in SC
†† also licensed in CA

December 15, 2009

Mr. Joseph Nazario
Joseph Charles, LLC.
2 Terrace Way, Suite C
Greensboro NC 27403

Mr. Joseph Nazario
7300 Silverwood Ct.
Greensboro NC 27410

RE:   *Bon Aqua International, Inc.*

Dear Mr. Nazario:

With regard to your various emails to Gerald and Connie Lowenstein, up to and including the email sent December 14, 2009, their response is as follows:

Bon Aqua International, Inc. has not and does not intend to terminate the option agreement dated June 2, 2008 between Bon Aqua International, Inc. and Joseph Charles, LLC. (the "Option Agreement"). Earlier emails from Gerald and Connie Lowenstein referenced the withdrawal of the Letter of Intent for the potential purchase of Bon Aqua International, Inc. by Joseph Charles and their reason for withdrawing that Letter of Intent was the lack of an appropriate response by you or persons affiliated with you.

As far as Bon Aqua International, Inc. is concerned, the Option Agreement is in place and will remain so until its expiration on June 2, 2010. That agreement contains no provisions allowing for early termination; however, given the financial state of Joseph Charles, LLC., we recognize that termination may be necessary. I would remind you that the Bon Aqua units in your possession are the property of Bon Aqua International, Inc. (see Clause 7 of the Option Agreement). Bon Aqua International, Inc. recognizes that Joseph Charles made an initial investment of $36.00 per unit for the purposes of stocking, said $36.00 to be reimbursed to Joseph Charles, LLC. as each unit was sold. So far, to the best of our knowledge, you have not sold a single unit.

To resolve this situation amicably, we are willing to do one of the following:

Bon Aqua International, Inc. will agree to terminate the Option Agreement with Joseph Charles, LLC. if all Bon Aqua units presently in the possession of Joseph Charles, LLC. are immediately returned to Bon Aqua International, Inc. Bon Aqua International, Inc. will then reimburse Joseph Charles, LLC. the $36.00 for each unit at the time Bon Aqua International, Inc. is able to sell that unit. Such sales will begin only after Gerald and Connie Lowenstein are able to sell the inventory already held by Bon Aqua International,

**Greensboro Office**
Post Office Box 41027 • Greensboro, North Carolina 27404-1027
3 North Elm Street, Suite 200 • Greensboro, North Carolina 27455
336 378.1899 • Fax 336 378 1850 • www.frb-law.com

**Charlotte Office**
301 McCullough Drive, 4th Floor • Charlotte, North Carolina 28262
704 970 1593 • www.frb-law.com
By Appointment Only

Case 1:10-cv-00169-CCE-LPA   Document 7   Filed 03/02/10   Page 57 of 86

Inc. You will remember that it was your decision to make the initial $36.00 per unit investment with the clear understanding per the agreement that the Bon Aqua units would remain the property of Bon Aqua International, Inc. Bon Aqua International, Inc. is agreeable to paying you at the point of sale, but not before.

Alternatively, you may retain the Bon Aqua units upon payment to Bon Aqua International, Inc. of $250.00 per unit, the standard dealer cost. The Option Agreement will be terminated, but you may, of course, retain a $36.00 reimbursement from each $250.00 per unit payment, submitting the remaining payment of $214.00 per unit to Bon Aqua International, Inc. At that point, the Bon Aqua units would belong to you and you would be free to market them as you see fit, still subject to the Confidentiality Agreement signed by you on June 2, 2009. I would also remind you that you are bound by the Option Agreement, Clause 5, not to enter into any contracts or arrangements to sell Bon Aqua units without the prior approval of Bon Aqua International, Inc.

Please send all responses directly to my attention at the address shown on this letter. I will expect your response shortly.

Sincerely,

*Barbara L. Stewart/cs*

Barbara L. Stewart,
Attorney



# Water Treatment Proposal

For:
**Elon University**
100 Campus Dr.
CB 2000
Elon, NC 27244

Presented To:

Paul Holt — *Maintainence Control Manager*
336-278-5460

7.24.08

**Bon Aqua International, Inc.**
In Partnership with Joseph Charles, LLC
2 Terrace Way, Suite C
Greensboro NC 27403
336.834.0570 (v)
336.834.0571 (f)

**b.a.i.**

## 1. Your Bon Aqua Team

Bon Aqua International, Inc. is pleased to provide **Elon College** with a water treatment program that has such a significant impact on our environment. We offer a water treatment program unequaled in the treatment of scale and corrosion in all water cooled heat exchange equipment. Although the Bon Aqua system alone is neither bacteriostatic nor bactericidal, the addition of our electrolytic ionizer creates an entirely chemical free treatment system, totally in accordance with the highest environment standards.

Bon Aqua has assembled a specialized team to provide you with industry leading water treatment services. Your service team stands ready to support you so that you derive the highest value from your investment and assist you in reducing your water consumption, energy consumption and operating costs.

This team will facilitate a smooth integration of our water treatment system into your normal business activities. The team will strive to meet your maintenance objectives, provide effective lines of communication and provide continuity so that your service is delivered in a seamless, transparent manner.

Your service team includes the following Bon Aqua professionals:

**Joe Nazario** will be your primary contact. His responsibility will be to provide support and coordination for the execution of your water treatment program. Joe is ultimately responsible for Bon Aqua's service relationship with **Elon College** and will strive to provide you with excellent customer service.
**Joe can be reached at: +336.215.0441.**

**Chuck Alexander** is also a member of your water treatment team. He will be your backup contact when **Joe** is not available.
**Chuck's contact information is +336.339.8668**

**Jerry Lowenstein,** is always available by telephone when you are not able to reach **Joe** or **Chuck**. As the manufacturer of the Bon Aqua technology, Jerry will be able to answer technical questions that may arise at anytime.
**Jerry can be reached at: +888.294.2424.**

**3.** Your Proposed Water Treatment Program for the **Science Building**

This proposal includes the materials and labor to install a Bon Aqua water treatment system for the equipment defined below with the pipe diameters., and will remain in effect for a period of thirty (30) days. Any other pipes or equipment are not included in the price of this contract. This proposal covers a normal installation on all metal pipes. Below is the equipment included under this proposal.

| EQUIPMENT | Installed Cost | ROI |
|---|---|---|
| Trane 660 Ton Condenser<br><br>*With*: One 10"Condensate Return Line<br>One 10" Supply Line<br>One 1"city water make up line | 24,127.00 | |
| Trane 185 Ton Condenser<br><br>*With:* One 6" Return Line<br>One 6" Supply Line<br>One 1" Make Up Line | $16,228.00 | |
| TOTAL | $40,355.00 | 1.40 years |

We have prepared a return on investment analysis, which shows in detail how we calculated your projected savings. Please note our savings do not include labor or maintenance expenses and does not take into account the annual cost of inflation. We have included the ROI worksheets so that you can see how we arrived at our calculations.

An installation appointment will be scheduled upon acceptance of this agreement, and an invoice will be submitted by for processing. Payment is due upon completion of installation. Guarantee, insurance, and warranty will be issued within ten days of receipt of payment.

**\*\*The addition of the optional 1200 C1 Carefree Clearwater Electrolytic Ionizer** makes this treatment program entirely chemical-free. The ionizer has electronic circuitry, which is sealed in a corrosion proof NEMA rated enclosure and meets or exceeds all UL and NSF standards for commercial applications. Periodic inspection of the anode is included with the first year's service when this option is chosen. **These are a $1,995.00 value per system. These will be supplied and installed at N/C**

Also included in this proposal package is:
1  A one year money back performance guarantee;
2  A one million dollar liability insurance certificate;
3  A twenty-five (25) year manufacturer's product warranty.

## Your Second Earth Team

Second Earth, Inc. is pleased to provide **Elon College** with a water treatment program that has such a significant impact on our environment. We offer a water treatment program unequaled in the treatment of scale and corrosion in all water cooled heat exchange equipment. Although the WRAP system alone is neither bacteriostatic nor bactericidal, the addition of our electrolytic ionizer creates an entirely chemical free treatment system, totally in accordance with the highest environment standards. In addition to this a recirculation mechanism will be installed at the tower. The purpose for this is to continuously recirculate, filter, and dilute the basin water at the tower as opposed to "bleeding" water with high TDS concentration which further increases efficiency by lessening the demand for makeup water. An option for remote monitoring can be installed for an additional cost as described in the table below.

Upon completing this installation and the necessary calibration process (30 days) the evaporative cooling system for the McMichael Science Building are now cathodically protected and bleedless.

Second Earth has assembled a specialized team to provide you with industry leading water treatment services. Your service team stands ready to support you so that you derive the highest value from your investment and assist you in reducing your water consumption, energy consumption and operating costs.

This team will facilitate a smooth integration of our water treatment system into your normal business activities. The team will strive to meet your maintenance objectives, provide effective lines of communication and provide continuity so that your service is delivered in a seamless, transparent manner.

## Your service team includes the following Bon Aqua professionals:

**Chris Hargett** will be your primary contact. His responsibility will be to provide support and coordination for the execution of your water treatment program. Chris is ultimately responsible for the service relationship with Elon College and will strive to provide you with excellent customer service. **Chris can be reached at: 336-420-6969.**

**Joe Nazario** is also a member of your water treatment team. He will be your backup contact when Chris is not available. **Joe's contact information is 336-215-0441**

## 2. Your Proposed Water Treatment Program for the Science Building

This proposal includes the materials and labor to install a WRAP water treatment system for the equipment defined below with the pipe diameters provided by you., and will remain in effect for a period of thirty (30) days Any other pipes or equipment are not included in the price of this contract. This proposal covers a normal installation on all metal pipes. Below is the equipment included under this proposal.

| Trane 660 Ton Condenser | Trane 185 Ton Condenser | |
|---|---|---|
| **Trane 660 Ton Condenser Cooling System** | **Trane 185 Ton Condenser  Cooling System** | |
| One 10" Return Line | One 6" Return Line | |
| One 10" Supply line | One 6" Supply Line | |
| One 1" Make up line | One 1" Make up Line | |
| | Carefree commercial electrolytic ionizer | |
| Commercial Electrolytic Ionizer (2 units) | | |
| Bleedless Tower Recirculation | (located at Tower) | $50,375.00 |
| Remote Monitoring (cellular based) | pH, A1, TDS at Tower and one (1) chiller | $4,000.00 |

- **Included in the above cost is:** a one year money back performance guarantee;

- A twenty-five (25) year manufacturer's product warranty.

An installation appointment will be scheduled upon acceptance of this agreement, and an invoice will be submitted by for processing. Payment is due upon completion of installation. Guarantee, insurance, and warranty will be issued within ten days of receipt of payment.

 

December 21, 2009

Gentlemen:

Several attempts have been made to resolve this matter amicably without costly litigation. This letter is being sent as a final attempt to resolve the issue of the disposition of the Bon Aqua units now in the possession of Joseph Charles. The options offered in the attached letter from our lawyer to Joseph Nazario have not been addressed, which necessitates this letter to each of you.

The option agreement, dated June 2, 2008, signed on behalf of Joseph Charles, L.L.C. by Joseph Nazario and Charles Alexander specifically prohibits any disposition of the Bon Aqua units without Bon Aqua International, Inc.'s explicit knowledge and permission. Likewise, the confidentiality agreement dated June 2, 2008, signed on behalf of Joseph Charles, L.L.C. by Joseph Nazario and Charles Alexander, includes, but is not limited to, non-disclosure of all pertinent information relating to Bon Aqua International's business and business practices. We have reason to believe that either or both of these agreements have been breached.

We understand that several major companies have been approached with Second Earth's (formerly Joseph Charles) new concept of water treatment utilizing Bon Aqua units, also being marketed as a "WRAP" system. Please be advised we intend to notify the ones we know of, such as Sears/K-Mart, Penney's, American Airlines, and Cal Tech through their corporate, legal, and purchasing offices that any Bon Aqua product they accept as a part of any water treatment package must be done with the written approval of the manufacturer, Bon Aqua International, Inc. Companies of this dimension have a tendency to avoid the prospect of any legal action.

Further, please be advised that we intend to take the same action with all of the outstanding proposals now in hand, presented by Joseph Charles, L.L.C. and/or Second Earth, Inc.

In your capacity as a partner, shareholder, investor, officer, representative, member, manager, agent, or employee of Joseph Charles, L.L.C. and Second Earth, Inc. you all share equally in the accountability of the company's actions. As such, we want to advise you that we intend to pursue any legal action necessary to remedy this situation.

If we have not received a response to attempt to resolve this situation by close of business Tuesday, December 29, 2008, we will proceed with the above-noted actions.

Sincerely,

Gerald H. Lowenstein, CEO

Connie Lowenstein, President

PO Box 19047
Greensboro, NC 27419-9047
Bai2@bonaqua.com

888.294.2424(V)
800.297.5644(F)
www.bonaqua.com

Case 1:10-cv-00169-CCE-LPA    Document 7    Filed 03/02/10    Page 64 of 86

## Bon Aqua Intl, Inc.

**From:** Barbara Stewart [blstewart@frb-law.com]
**Sent:** Sunday, December 27, 2009 3:47 PM
**To:** Bon Aqua
**Subject:** FW: Bon Aqua International

We need to discuss this

**From:** Robert [mailto:rhaskin@triad.rr.com]
**Sent:** Tuesday, December 22, 2009 2:24 PM
**To:** Barbara Stewart
**Subject:** Bon Aqua International

Dear Ms. Stewart:

I am in receipt of a letter dated December 15, 2009 from you to Joe Nazario and a letter dated December 21, 2009 from Gerald and Connie Lowenstein to JC Associates. Both documents were sent to me by the Lowenstein's on December 21st. Please note that I am not affiliated with Joseph Charles and communications between you and/or your clients and Joseph Charles should be confidentially maintained between those parties.

Presumably your clients chose to forward that material to me because of some confusion on their part concerning the name "Second Earth." I am aware that Joseph Charles LLC had used the name "Second Earth" in some limited capacity in the past. However, Second Earth, Inc. presently owns all rights to the name.

As President & CEO of Second Earth, Inc. I am concerned with several statements that your clients make in their December 21st letter. In particular:

(1) The suggestion that Second Earth, Inc. was formerly Joseph Charles is incorrect. Second Earth, Inc. is an independent corporation which I recently formed. Joseph Charles is a limited liability company that I understand is insolvent or otherwise defunct. The principals in that company have formed a new company by the name of Creative One. I am not a part of either of those organizations, nor have I ever been a part of either of those organizations.

(2) The allegation that Second Earth is "utilizing" your clients product is incorrect. Second Earth, Inc. has not entered into any business relationship with Bon Aqua International; has no intention of entering into any business relationship with Bon Aqua International; has not marketed, promoted or sold Bon Aqua International product and does not intend to do so in the future.

(3) Your clients threat to "notify" Second Earth's customers or prospective customers as outlined in paragraphs three and four of the letter is particularly disconcerting. As you know, interference with business relations is a very serious matter. So that there is no basis for misunderstanding or confusion in the future, I want to be very clear on this: **Second Earth's "new concept of water treatment" does not utilize your clients product.**

The Lowenstein's letter of December 21, 2009, paragraph 3, makes it abundantly clear that they intend to:

- improperly contact Second Earth customers and prospective customers;
- falsely accuse Second Earth of utilizing Bon Aqua Internationals product;
- falsely suggest to Second Earth's customers and prospective customers that they will get caught up in a law suit if they do business with Second Earth; and
- thereby damage Second Earth's business ("Companies of this dimension have a tendency to avoid the prospect of any legal action").

Any contact, whether written or oral, that your clients or their agents have with Second Earth's customers or prospective customers, in an effort to disrupt the companies business is libelous per se and will be met with swift legal action. I trust that you will be able to control your clients and prevent improprieties from occurring in the future.

Please let me know if you have any questions or comments.

Sincerely,

Robert

HOME | WATER | ENERGY | MONITORING SYSTEMS |
Customer Testimonials | Education Video



## Bon Aqua Training

- Sales Presentations/Sales Tools --Registered Agents Only.
- Sales Training --Registered Agents Only.
- Service Training--Registered Agents Only.
- Installation Training--Registered Agents Only.
- Technical Session and History--Registered Agents Only.
- Mechanical Assets--Registered Agents Only.
- Payment Options--Registered Agents Only.
- A-Z Bon Aqua--Registered Agents Only.
- Inspection Training--Registered Agents Only.
- Standardized Coding--Registered Agents Only.

See Other Web Pages For Additional Details.



**CONTACT US AT:** 1-336-834-0570 | **EMAIL US AT:** info@secondearthinc.com

| WATER | ENERGY | MONITORING SYSTEMS | TRAINING

 *secondearth*

*New Ideas for a Smart Planet*

## Our Company Mission

Second Earth delivers the most cost-effective and proven sustainable technologies available today. Our company provides the trusted gateway between innovative eco-friendly products and the organizations that will most benefit from them. We identify and test new products, implement those products, monitor the long-term results, and ultimately reduce our clients operating expenses in the most sustainable manner possible.



Check Out Our Outstanding
Water Management Product
Bon Aqua

CONTACT US AT: 1-336-834-0570 | EMAIL US AT: Info@secondearthinc.com



## What Is Bon Aqua?

Bon Aqua is a patented, environmental water treatment technology that is applied to steam boilers, cooling towers, chiller condensers, and all water-cooled heat exchange equipment. Taking it a step further, it is a physical water treatment alternative for the above listed systems that eliminates corrosion and scale build up permanently. The Bon Aqua system ultimately reduces operating costs for large facilities that use chilled water systems for air conditioning and boiler systems for heating. Bon Aqua delivers these cost savings through reducing water consumption, reducing electricity consumption, and virtually eliminating the use of certain toxic chemicals in these HVAC systems.

See Other Web Pages For Additional Details.



**CONTACT US AT:** 1-336-834-0570 | **EMAIL US AT:** info@secondearthinc.com

HOME |          | ENERGY | MONITORING SYSTEMS | TRAINING
                                | THE BON AQUA DIFFERENCE



## Here's How Bon Aqua Benefits Your Organization:

- Water Treatment Superior to Chemicals.
- Decreased Maintenance and Repair on Critical HVAC System Components.
- Increased Asset Life.
- Significant Water Savings — Reducing Your Operating Costs.
- Substantial Energy Savings — Reducing Your Operating Costs.
- Elimination of Toxic Chemicals — Reducing Water Pollution.
- Simplified Environmental Compliance: *There's no need to manage toxic chemicals and you reduce your carbon footprint by reducing the amount of water treated at the wastewater plant.*
- Recycling of Bleed Water: *Since the water is no longer toxic, you can re-use it for irrigation or plumbing purposes.*
- LEED Certification Points.

Like all Second Earth products, Bon Aqua helps you save the planet
while conserving your organization's financial resources.



**CONTACT US AT:** 1-336-834-0570 | **EMAIL US AT:** info@secondearthinc.com

HOME |     | ENERGY | MONITORING SYSTEMS | TRAINING
WHAT BON AQUA ACHIEVES |



## Advantages of Bon Aqua Over Other
## Physical Water Treatment Systems:

- Bon Aqua is simple installation that requires no cutting of pipe or HVAC system shutdown.
- Bon Aqua has no moving parts, making it the most reliable product of it's kind.
- Bon Aqua delivers measurable positive results in a short time period.
- Bon Aqua has provided a very solid track record with clients for more than 20 years.
- Bon Aqua has proved its effectiveness in numerous independent tests.
- Bon Aqua effectively protects your systems and yet needs no external power source.

Beyond these advantages, the Second Earth team empowers each customer to understand and manage
their ongoing water treatment process. Our flexible approach enables each customer to manage their
systems on their own or contract with us for long-term system maintenance.



CONTACT US AT: 1-336-834-0570 | EMAIL US AT: info@secondearthinc.com

Case 1:10-cv-00169-CCE-LPA    Document 7    Filed 03/02/10    Page 70 of 86



## COMING SOON.

## Please contact us for more information at: 1-336-834-0570
## OR please reach us by EMAIL AT: info@secondearthinc.com

See Other Web Pages For Additional Details.

**CONTACT US AT:** 1-336-834-0570 | **EMAIL US AT:** Info@secondearthinc.com

HOME | WATER | ENERGY |          | TRAINING



## COMING SOON.

### Please contact us for more information at: 1-336-834-0570
### OR please reach us by EMAIL AT: info@secondearthinc.com

See Other Web Pages For Additional Details.



CONTACT US AT: 1-336-834-0570 | EMAIL US AT: info@secondearthinc.com



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Jan 26 04:04:16 EST 2010*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |
| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

( Logout ) Please logout when you are done to release system resources allocated for you.

( Start ) List At: _____ OR ( Jump ) to record: _____ **Record 1 out of 3**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# BON AQUA V

| | |
|---|---|
| **Word Mark** | **BON AQUA V** |
| **Goods and Services** | IC 011. US 013 021 023 031 034. G & S: Industrial-water purifying apparatus; Sustainable onsite water recycling and wastewater treatment systems; Water conditioning units; Water purifying units, for potable water for industrial use |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77901158 |
| **Filing Date** | December 27, 2009 |
| **Current Filing Basis** | 1B |
| **Original Filing Basis** | 1B |
| **Owner** | (APPLICANT) Second Earth Inc. CORPORATION NORTH CAROLINA 3716C Alliance Drive Greeensboro NORTH CAROLINA 27407 |
| **Attorney of Record** | Donald R. McPhail |

Case 1:10-cv-00169-CCE-LPA   Document 7   Filed 03/02/10   Page 73 of 86

**Type of Mark** TRADEMARK

**Register** PRINCIPAL

**Live/Dead Indicator** LIVE

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**Thank you for your request. Here are the latest results from the <u>TARR web server.</u>**

**This page was generated by the TARR system on** 2010-01-26 16:39:54 ET

**Serial Number:** 77901158 <u>Assignment Information</u> <u>Trademark Document Retrieval</u>

**Registration Number:** (NOT AVAILABLE)

**Mark**

# BON AQUA V

**(words only):** BON AQUA V

**Standard Character claim:** Yes

**Current Status:** Newly filed application, not yet assigned to an examining attorney.

**Date of Status:** 2009-12-30

**Filing Date:** 2009-12-27

**Filed as TEAS Plus Application:** Yes

**Currently TEAS Plus Application:** Yes

**Transformed into a National Application:** No

**Registration Date:** (DATE NOT AVAILABLE)

**Register:** Principal

**Law Office Assigned:** (NOT AVAILABLE)

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 042 -New Application Processing

**Date In Location:** 2009-12-30

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Second Earth Inc.

**Address:**
Second Earth Inc.
3716C Alliance Drive
Greeensboro, NC 27407
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** North Carolina

## GOODS AND/OR SERVICES

**International Class:** 011
**Class Status:** Active
Industrial-water purifying apparatus; Sustainable onsite water recycling and wastewater treatment systems;
Water conditioning units; Water purifying units, for potable water for industrial use
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

## ADDITIONAL INFORMATION

(NOT AVAILABLE)

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document
Retrieval" shown near the top of this page.**

2010-01-01 - Notice Of Pseudo Mark Mailed

2009-12-31 - New Application Office Supplied Data Entered In Tram

2009-12-30 - New Application Entered In Tram

# ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
Donald R. McPhail

**Correspondent**
DONALD R. MCPHAIL
DUANE MORRIS LLP
505 9TH ST NW STE 1000
WASHINGTON, DC 20004-2166
Phone Number: 202-776-7894

Document Description: **TEAS Plus New Application**
    Mail / Create Date: **27-Dec-2009**

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2008)

# Trademark/Service Mark Application, Principal Register

# TEAS Plus Application

### Serial Number: 77901158
### Filing Date: 12/27/2009

*NOTE: Data fields with the \* are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | YES |
| **MARK INFORMATION** | |
| **\*MARK** | BON AQUA V |
| **\*STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | BON AQUA V |
| **\*MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | Second Earth Inc. |
| **\*STREET** | 3716C Alliance Drive |
| **\*CITY** | Greeensboro |

| *STATE (Required for U.S. applicants) | North Carolina |
|---|---|
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 27407 |

## LEGAL ENTITY INFORMATION

| *TYPE | CORPORATION |
|---|---|
| * STATE/COUNTRY OF INCORPORATION | North Carolina |

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| *INTERNATIONAL CLASS | 011 |
|---|---|
| IDENTIFICATION | Industrial-water purifying apparatus; Sustainable onsite water recycling and wastewater treatment systems; Water conditioning units; Water purifying units, for potable water for **industrial use** |
| *FILING BASIS | SECTION 1(b) |

## ADDITIONAL STATEMENTS INFORMATION

| *TRANSLATION (if applicable) | |
|---|---|
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |

## ATTORNEY INFORMATION

| NAME | Donald R. McPhail |
|---|---|
| ATTORNEY DOCKET NUMBER | T2888-00004 |
| FIRM NAME | Duane Morris LLP |
| STREET | 505 9th Street, NW |
| INTERNAL ADDRESS | Suite 1000 |
| CITY | Washington |

| STATE | District of Columbia |
|---|---|
| COUNTRY | United States |
| ZIP/POSTAL CODE | 20004 |
| PHONE | 202-776-7894 |
| EMAIL ADDRESS | drmcphail@duanemorris.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## CORRESPONDENCE INFORMATION

| *NAME | Donald R. McPhail |
|---|---|
| FIRM NAME | Duane Morris LLP |
| *STREET | 505 9th Street, NW |
| INTERNAL ADDRESS | Suite 1000 |
| *CITY | Washington |
| *STATE (Required for U.S. applicants) | District of Columbia |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 20004 |
| PHONE | 202-776-7894 |
| *EMAIL ADDRESS | drmcphail@duanemorris.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| NUMBER OF CLASSES | 1 |
|---|---|
| FEE PER CLASS | 275 |
| *TOTAL FEE PAID | 275 |

## SIGNATURE INFORMATION

| * SIGNATURE | /Donald R. McPhail/ |
|---|---|
| * SIGNATORY'S NAME | Donald R. McPhail |
| * SIGNATORY'S POSITION | Attorney of record, DC bar member |
| * DATE SIGNED | 12/27/2009 |

tp://tmportal.uspto.gov/external/PA_1_0_LT/OpenServletWindow?s...=FTK&currentPage=1&rowNum=3&rowCount=3&formattedDate=27-Dec-2009                Page 3 of 6

Case 1:10-cv-00169-CCE-LPA   Document 7   Filed 03/02/10   Page 80 of 86

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2008)

# Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

### Serial Number: 77901158
### Filing Date: 12/27/2009

## To the Commissioner for Trademarks:

**MARK:** BON AQUA V (Standard Characters, see mark)
The literal element of the mark consists of BON AQUA V.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Second Earth Inc., a corporation of North Carolina, having an address of
    3716C Alliance Drive
    Greeensboro, North Carolina 27407
    United States
requests registration of the trademark/service mark identified above in the United States Patent and
Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051
et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
    International Class 011: Industrial-water purifying apparatus; Sustainable onsite water recycling and
wastewater treatment systems; Water conditioning units; Water purifying units, for potable water for
industrial use
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related
company or licensee the mark in commerce on or in connection with the identified goods and/or services.
(15 U.S.C. Section 1051(b)).

The applicant hereby appoints Donald R. McPhail of Duane Morris LLP
    Suite 1000
    505 9th Street, NW
    Washington, District of Columbia 20004
    United States
to submit this application on behalf of the applicant. The attorney docket/reference number is T2888-
00004.
The docket/reference number is T2888-00004.

ttp://tmportal.uspto.gov/external/PA_1_0_LT/OpenServletWindow?s...=FTK&currentPage=1&rowNum=3&rowCount=3&formattedDate=27-Dec-2009    Page 4 of 6

Case 1:10-cv-00169-CCE-LPA   Document 7   Filed 03/02/10   Page 81 of 86

Correspondence Information: Donald R. McPhail
                           Suite 1000
                           505 9th Street, NW
                           Washington, District of Columbia 20004
                           202-776-7894(phone)
                           drmcphail@duanemorris.com (authorized)

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Donald R. McPhail/   Date Signed: 12/27/2009
Signatory's Name: Donald R. McPhail
Signatory's Position: Attorney of record, DC bar member


RAM Sale Number: 5487
RAM Accounting Date: 12/28/2009

Serial Number: 77901158
Internet Transmission Date: Sun Dec 27 15:08:15 EST 2009
TEAS Stamp: USPTO/FTK-12.144.20.254-2009122715081567
4732-77901158-460fc5cf4a968c1649dcd69901
2388dae-DA-5487-20091227150626164226


TDR Home

This document may be displayed as a PDF file containing images without text. You may view online or

save the entire document by clicking on the file download icon in the upper right corner of this page.
[required PDF viewer]
FAQ: Are you seeing only the first page of this PDF document?

*If you need help:*

- *General trademark information: Please e-mail TrademarkAssistanceCenter@uspto.gov, or telephone either 571-272-9250 or 1-800-786-9199.*
- *Technical help: For instructions on how to use TDR, or help in resolving technical glitches, please e-mail TDR@uspto.gov. If outside of the normal business hours of the USPTO, please e-mail Electronic Business Support, or call 1-800-786-9199.*
- *Questions about USPTO programs: Please e-mail USPTO Contact Center (UCC).*

**NOTE:** *Within any e-mail, please include your telephone number so we can talk to you directly, if necessary. Also, include the relevant serial number or registration number, if existing.*

p://tmportal.uspto.gov/external/PA_1_0_LT/OpenServletWindow?s...=FTK&currentPage=1&rowNum=3&rowCount=3&formattedDate=27-Dec-2009                Page 6 of 6

Case 1:10-cv-00169-CCE-LPA   Document 7   Filed 03/02/10   Page 83 of 86



### Second Earth, Inc.

Address: 2 Terrace Way Suite C
Greensboro, NC 27403
Phone: 336-834-0570 336-420-8969
Fax: 336-834-0571
Website: http://secondearthinc.com
Contact: Mr. Chris Hargett

Year Established: 1988
Sector Served: Public and Private
Typical Project Size: $500 to $50,000
Labor Affiliation: Prevailing Wage

Geographical Areas Serviced:

- Worldwide

Blue Book Classifications:

♦ Building Maintenance Contractors
♦ Water Treating Service & Equipment
♦ Cooling Towers

Recent Projects Completed:

- **Meredith College**
  Dollar Value: N/A / Completion: Ongoing
- **Starmount Company**
  Dollar Value: N/A / Completion: Ongoing

Manufacturer Certifications:

- LEED Points

Trade Associations/Government Certifications:

- U.S. Green Building Council

Name Brands/Products Installed/Supplied:

- Bon Aqua

*Profile Data Last Updated: 12/04/09*
*2606846-0*

My Notes on this Company: [ Add ]

Browse Ads | Prev Profile | Next Profile | Back to Listings | New Search

**CONTRACTORS REGISTER, INC.**
JEFFERSON VALLEY, NY 10535 - (800) 431-2584 FAX: (914) 243-0287
WWW.THEBLUEBOOK.COM - EMAIL: INFO@THEBLUEBOOK.COM
PRIVACY POLICY - TERMS OF USE - SITE MAP
COPYRIGHT © 2010 CONTRACTORS REGISTER, INC.

# Saving Water through Technology April 2, 2009

**NO-SALT Water Softener**
Premium Hard Water Conditioner &
Descaler System. Free S&H. Now
$179
www.equinox-products.com


**Lower Your Water Bill**
Save on water, energy and chemicals
Let AAG Inc. conduct a Free Audit..
www.noh2odischarge.com/Third

Sometimes, due to external circumstances, a product that has been around for a long time becomes economically and socially viable seemingly overnight. No one would argue that water shortages plague many areas of the globe and especially throughout many regions of the southeastern United States.

Though the product Bonaqua® (now from Joseph Charles, Inc.) has been around for more than 20 years, it was never marketed appropriately, in part because water was in relatively plentiful supply. This leading-edge process eliminates the need for chemicals, often used to remove the minerals and other impurities that cause scale and corrosion in water pipes.

Even more impressive is that in most cases, the product can be installed in a day and requires no external power source.

Already installed selectively around the world, this technology makes being environmentally responsible not only economically feasible, but actually profitable. When Meredith College in Raleigh, North Carolina installed the system, the college saved USD$36,000 in chemicals and 6.1 Million gallons of water (almost USD$50,000). Moreover, Meredith realized increased efficiency of its equipment and the lengthening of asset life. The breakeven on Meredith's investment came at a remarkable seven and a half months.

The Bonaqua process uses a magnetic wrap-around system that capitalizes on the laws of physics. Bon Aqua's magnetic strength readily penetrates iron/copper pipes with a dense enough magnetic field to cause an electric current to be generated in the water. This electric current creates a Faraday generator, with the flowing water being the armature, the steel pipe being the field coil, and the ground supplying the constant flow of electrons through the pipe and into the water. For more, visit www.bonaqua.com.

The patented Bonaqua water treatment system is a permanent and totally passive non-chemical method of water treatment that requires a minimum amount of monitoring, no outside power source, in which very little water is wasted. Plus, it is absolutely

non-polluting. Bonaqua is a shining example of the green technologies that will become more and more important in years to come. It is a win-win-win system that features significant energy savings, environmental compliance and icreased production.

"From 'The Herman Trend Alert,' by Joyce Gioia-Herman, Strategic Business Futurist. http://www.hermangroup.com.

### More fun

### *To learn more about water saving technologies, continue your search here.....*

Google [                    ]  ( Search )

**Ads by Google**    Hot Water Pump      Water Crystals      Water Pollution      Eco Friendly House    Wastewater Treatment
Guyot findings home| *Contact information*| About us| Irregular E-Letter| Jewelry Findings Glossary of Terms
Frequently Asked Questions| Online jewelry findings catalogs, Stamped filigree findings, Decorative findings,
Charms and Novelties|
the jewelry book shelf| jewelry and jewelry history| Site map| Privacy policy| Fun| Company Store

ALL Guyot Brothers jewelry findings are Made in USA

(c) 2003-2010 Guyot Brothers Co Inc, *A jewelry findings manufacturer*